Argued and submitted December 11, 1980, reversed and
remanded for further proceedings April 20, 1981

## STATE OF OREGON,
### *Appellant,*
*v.*
## SHARON RAE HACKER,
### *Respondent.*

## (No. 10-79-11713, CA 17924)

627 P2d 11

Ronald R. Sticka, Assistant District Attorney, Eugene, argued the cause for appellant. With him on the brief was J. Pat Horton, District Attorney, Eugene.

William D. Young, Eugene, argued the cause for respondent. With him on the brief was Spinner & Young, Eugene.

Before Richardson, Presiding Judge, and Thornton and Buttler, Judges.

RICHARDSON, P.J.

## RICHARDSON, P.J.

The state appeals an order suppressing all evidence sought to be introduced in defendant's trial. At the outset of the suppression hearing, the state conceded that a search warrant executed at defendant's residence on November 14, 1979, was defective. *See State v. Montigue,* 288 Or 359, 605 P2d 656 (1980).[1] The state sought introduction of "derivative" evidence, which it contended was not "tainted" by the illegal search. The issue is whether the state's physical and testimonial evidence were properly suppressed under the "fruit of the poisonous tree doctrine." We reverse and remand.

Defendant was indicted for forgery in the first degree (ORS 165.013) and theft in the first degree (ORS 164.055), allegedly arising out of acts committed on approximately November 5, 1979. Specifically, defendant was charged with uttering a forged check drawn on the account of the Columbus Club in Eugene in the sum of $220.55 and with theft of currency in that sum from the Safeway Store in Springfield, where the check was allegedly passed.

The trial court made no findings of fact and did not discuss orally any factual determinations or any theory as the basis of its order. Defendant offered no evidence during the suppression hearing.

In *State v. Johnson/Imel,* 16 Or App 560, 519 P2d 1053, *rev den on Imel* (1974), we outlined the dilemma facing an appellate court in reviewing the action of a trial court on a motion to suppress evidence where the trial court's theory is not disclosed by the order or by specifics of defendant's motion. Because we could not discern which of several possible theories the trial court utilized, we remanded for further proceedings to cure the inadequacies of the order. We conclude that approach is appropriate here.

Defendant's motion requested suppression of "* * * any items, statements, testimony or other evidence obtained wholly or in part as a result of any investigation

_____

[1] The decision in *Montigue* was handed down after the warrant and affidavit were issued and executed but before the suppression hearing. Based on *Montigue,* the state conceded that any evidence obtained as a "direct result" of the warrant's execution was inadmissible.

conducted as a product, fruit, or result of the search and seizure of defendant's residence on November 14, 1979." This motion was sufficient to apprise the state and the court of the general theory upon which defendant sought suppression, the theory is known as the "fruit of the poisonous tree doctrine." As will be discussed in detail later in this opinion, there are a number of exceptions to this adaptation of the exclusionary rule. The exceptions involve mixed questions of law and fact. The resolution of a motion may depend on factual determinations and application of one of a number of legal theories to the historical facts. The evidence sought to be suppressed in this case is varied and may be accepted or excluded on different legal bases. If the trial court accepted the facts as presented by the state's evidence, including what would have been done regarding the investigation of the forgery had there not been a search, we conclude the court would have been in error. If, however, the court rejected some of the state's evidence, we are unable to determine from the order on what legal or factual basis each piece of evidence or each witness' testimony was excluded. We remand to the trial court for an order setting forth the court's findings of fact and the basis for excluding the evidence. In order to expedite the ultimate conclusions we will initially assume, for the purposes of discussion, that the court found the facts in conformity with the uncontroverted evidence presented by the state and set forth the legal bases for admitting the evidence. We summarize the evidence presented by the state.

On November 14, 1979, Eugene police officers executed a search warrant at defendant's residence in Eugene for the purpose of obtaining evidence of narcotics offenses. Among the items seized during the search were identification in the name of a Donna Sue Franks and a check payable to that person drawn on the Columbus Club account.[2] After completion of the search, defendant was arrested and "booked" at police headquarters. As part of this process, defendant was photographed and an arrest record

---

[2] These items were conceded by the state at the suppression hearing to be inadmissible as "direct fruits" of the illegal search. No issue concerning this evidence is before us now.

was made, which included the photograph and other pertinent data relating to her arrest. As a result of the seizure of these items, Eugene authorities began an investigation of defendant for the crimes of forgery and theft.

As part of this investigation, Officer Michaud of the Eugene Police Department contacted Mr. George Reiter, business manager of the Columbus Club, to determine whether the club was missing any checks and whether any such checks had been negotiated. Though previously unaware of any missing checks, Reiter discovered up to fifteen unaccounted for checks. As a result, he immediately contacted the club's bank and placed stop payment orders on all the missing checks.

On approximately November 5, 1979, one of the missing checks had been negotiated at the Springfield Safeway store by a woman representing herself as Donna Sue Franks. In due course, Safeway presented the check to the bank for payment. The store was notified that payment would be refused due to the stop payment order placed by Mr. Reiter. On approximately November 30, 1979, the check was returned to Safeway and Mr. Miller, manager of the store, contacted Reiter. Reiter told Miller that the check was dishonored because it was a forgery and advised Miller to contact the Eugene police. Instead, Miller contacted the Springfield Police Department, and the check was turned over to Officer Zito. At that time Miller told Officer Zito that defendant had been arrested in Eugene for possession of stolen checks similar to the one passed in the store. Officer Zito thereafter prepared an incident report which included this information regarding defendant.

In early December, Officer Zito delivered the check and his report to Detective Vaught, a Springfield forgery and fraud officer. At that time Vaught was aware neither of the search of defendant's residence nor any investigation involving defendant. Detective Vaught did not commence any active investigation of the forgery at that time.

Within the next two weeks, Detective Vaught met with Detective Hooker of the Eugene Police Department to discuss forgery or fraud investigations the two departments presently had under way. During that meeting,

Vaught learned of Hooker's investigation of forgeries involving Columbus Club checks. To avoid unnecessary duplication of effort, Vaught released the Safeway check to Hooker and thereafter ceased any involvement with the investigation regarding the Columbus Club checks.

After receiving the Safeway check, Detective Hooker contacted Helmuth Ferber, who had accepted the check in his capacity as an assistant manager of the Safeway store. Detective Hooker showed Ferber a photographic lineup which included the picture of defendant taken at the time of her arrest on November 14, 1979. Ferber selected the photograph of defendant as the person who negotiated the check and who had represented herself as Donna Sue Franks. Thereafter, Detective Hooker contacted Reiter and Donna Sue Franks. Eventually, by reason of the investigation, defendant was indicted for the present charge.

At the suppression hearing, the state called six witnesses: Helmuth Ferber, Donna Sue Franks, Officer Zito, Detective Vaught, George Reiter and Detective Hooker, and sought introduction of two physical exhibits: the Safeway check and the photographic lineup. Defendant moved to suppress the physical evidence and the testimony of all the witnesses as being inadmissible under the "fruit of the poisonous tree doctrine." The state argued that all the evidence was admissible under one or more of the recognized exceptions to that doctrine.

■ The "fruit of the poisonous tree doctrine," first developed in *Silverthorne Lumber Co. v. United States,* 251 US 385, 40 S Ct 182, 64 L Ed 319 (1920), and later explicated in *Wong Sun v. United States,* 371 US 471, 83 S Ct 407, 9 L Ed 2d 441 (1963); *see Nardone v. United States,* 308 US 338, 60 S Ct 266, 84 L Ed 307 (1939), forbids, under certain circumstances, evidence obtained either directly or indirectly as a result of a violation of a defendant's Fourth Amendment rights from being used to secure a conviction. *Mapp v. Ohio,* 367 US 643, 81 S Ct 1684, 6 L Ed 2d 1081, 84 ALR2d 933 (1961); *Silverthorne Lumber Co. v. United States, supra.*[3]

---

[3] The use of evidence discovered as a result of an unlawful search is addressed in ORS 133.683:

■ The exclusionary rule's prime purpose is to deter unlawful police conduct. The rule seeks to protect Fourth Amendment rights through this deterrent effect, rather than by depending simply on a personal remedy for those aggrieved. *United States v. Calandra,* 414 US 338, 94 S Ct 613, 38 L Ed 2d 561 (1974); *Elkins v. United States,* 364 US 206, 80 S Ct 1437, 4 L Ed 2d 1669 (1960). Application, therefore, is limited to the extent necessary to achieve this deterrent effect. Stated differently, since the application of the "fruit of the poisonous tree doctrine" prevents consideration of otherwise relevant evidence in the factfinding process, application is withheld where such deterrence will not be accomplished. As noted recently by the Supreme Court in *State v. Quinn,* 290 Or 383, 623 P2d 630 (1981):

"* * * The device of excluding trustworthy evidence from the factfinding process in order to serve higher purposes 'is a needed, but grudgingly taken medicament; no more should be swallowed than is needed to combat the disease.' Amsterdam, *Search, Seizure, and Section 2255,* 112 U Pa L R 378, 389 (1964). The same policy is embodied in ORS 133.683, *supra,* which allows such evidence if 'the court finds that exclusion of such evidence is not necessary to deter violations of' the search warrant statutes. * * *" 290 Or at 397.

With the above principles in mind, the courts have carved out three recognized exceptions to the rule. The first, stated in *Silverthorne Lumber Co. v. United States, supra,* is that derivative evidence may be used so long as knowledge of that evidence can be attributed to a source independent of the unlawful conduct. The second, initially recognized in *Nardone v. United States, supra,* allows use of such evidence where the connection between the evidence

---

"If a search or seizure is carried out in such a manner that things seized in the course of the search would be subject to suppression, and if as a result of such search or seizure other evidence is discovered subsequently and offered against a defendant, such evidence shall be subject to a motion to suppress unless the prosecution establishes by a preponderance of the evidence that such evidence would have been discovered by law enforcement authorities irrespective of such search or seizure, and the court finds that exclusion of such evidence is not necessary to deter violations of ORS 133.525 to 133.703."

We do not view that statute as the exclusive method of determining the admission of derivative evidence, nor do we conclude that the statute sets forth a standard different from the federal constitutional principles herein explained. Thus, if the state meets the constitutional standard it also meets the statutory requirements.

and the misconduct is so "attenuated" as to dissipate the taint. As stated in *Wong Sun:*

> "* * * We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of the illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959). * * *" 371 US at 487-88.

The court rejected a literal "but for" test and indicated that where the chain between the challenged evidence and the "primary illegality" is long or can only be established through sophisticated argument, the likelihood that the police officers foresaw the challenged evidence as a probable product of their illegal conduct is remote. Under such circumstances, suppression of the evidence would not serve the purposes of the exclusionary rule. *See United States v. Ceccolini,* 435 US 268, 98 S Ct 1054, 55 L Ed 2d 268 (1978); *Brown v. Illinois,* 422 US 590, 95 S Ct 2254, 45 L Ed 2d 416 (1975); *Wong Sun v. United States, supra.*

The third exception, the "inevitable discovery" or "hypothetical independent source" rule, is codified in ORS 133.683, which allows the use of derivative evidence if "the prosecution establishes by a preponderance of the evidence that such evidence would have been discovered by law enforcement authorities irrespective of such search and seizure." *See also State v. Brown,* 47 Or App 201, 613 P2d 1107 (1980); *State v. Garrison,* 21 Or App 155, 534 P2d 210, *rev den* (1975). As stated in *State v. Williams,* 285 NW 2d 248 (Iowa 1979):

> "In order to satisfy its burden, the State must show that the evidence *would* have been discovered. A showing that discovery *might* have occurred is entirely inadequate. Two points arise here. First, the State must show how the evidence would have been discovered. The precision required here will vary somewhat with the circumstances of the case. Situations in which the evidence was well hidden, or in which time would be a critical factor, would require a better showing on the part of the State as to exactly how or

when discovery would have occurred. Second, a determination that a discovery would have come about must rest upon the record. * * *" 285 NW 2d at 260.

So long as the police did not act in bad faith for the purpose of hastening the discovery of the evidence in question, such evidence is admissible if it would have been discovered by lawful means. *See* 3 W. LaFave, *Search & Seizure,* §11.4 (1978).

The state, as noted, argues that one or more of these rules applies with regard to each piece of evidence suppressed. We review separately the various proffered evidence to determine the correctness of the state's position, based on the assumption the court found the facts in conformity with the state's evidence as summarized above.

## I. Physical Evidence

### 1. *The Safeway Check*

■ The state submits that the check is admissible by application of either the "inevitable discovery" or the "attenuation" exception to the exclusionary rule. At the suppression hearing, Mr. Reiter testified that had the matter of the stolen checks and forgeries not come to his attention by Eugene police personnel, he would have routinely reviewed any negotiated checks when they were returned from the bank. Upon discovering the forgery, he testified that he would have notified both the bank and police of that fact and would have authorized release of the check to the police. On the basis of this testimony, the state argues that it was inevitable that the Safeway check would have ultimately been discovered. We agree. The check would have been discovered in the normal course, and it would have thereafter been placed in the custody of the Eugene police. Assuming the trial court accepted the evidence presented, the check should not have been suppressed.

### 2. *Photographic Lineup*

Admissibility of evidence of this nature, though subject to much discussion in other jurisdictions, has not been passed upon before by appellate courts of this state. The state argues that defendant's photograph was taken as part of a routine administrative procedure for identification purposes and not for the purpose of exploiting evidence seized earlier. Therefore, the state argues, the evidence was

either not obtained by "an exploitation of the illegality" or was obtained "by means sufficiently distinguishable to be purged of the primary taint."

■■ The mere fact that the search was illegal does not make the photographic identification procedure conducted incident to defendant's arrest also unlawful. The important considerations in determining whether there has been exploitation of the prior illegality are the purpose and flagrancy of any official misconduct. *Brown v. Illinois, supra.* If an unlawful arrest was purely for investigative purposes, solely to acquire identification evidence regarding defendant, the evidence should be suppressed. *United States v. Crews,* 445 US 463, 100 S Ct 1244, 63 L Ed 2d 537 (1980); *Davis v. Mississippi,* 394 US 721, 89 S Ct 1394, 22 L Ed 2d 676 (1969); *United States v. Edmons,* 432 F2d 577 (2d Cir 1970).

■ In the present case there appears to be no evidence to support an inference that the warrant's execution or defendant's arrest were made for the purpose of securing her identification. The warrant, though conceded to be based on an insufficient affidavit, was secured to search defendant's premises for narcotics and not for the purposes of obtaining defendant's photograph or her identification. The photograph was taken as a part of routine procedure. There is nothing in the record from which to conclude that the search and subsequent arrest was a subterfuge to obtain identification to connect defendant with other crimes. *See People v. Price,* 76 Ill App 3d 613, 31 Ill D 879, 394 NE 2d 1256 (1979); *People v. Washington,* 60 Ill App 3d 662, 18 Ill D 244, 377 NE 2d 397 (1978); *People v. Pettis,* 12 Ill App 3d 123, 298 NE 2d 372 (1973); *State v. Maier,* 378 So 2d 1288 (Fla App 1979); *Taylor v. State,* 92 Nev 158, 547 P2d 674 (1976).

If the trial court determined that defendant's identity and her possible connection with the stolen checks was suppressible because this information was first discovered as a direct result of the search, we conclude that would also be incorrect. In *United States v. Crews, supra,* the Supreme Court reviewed a challenge to the testimony of a witness based on the poisonous fruit doctrine. Defendant had been

arrested, concededly without probable cause, for the principal purpose of taking his photograph for use in a photo line-up. The victim of the robbery selected defendant's photograph, and he was indicted and convicted of the robbery. He contended first that the witness' testimony identifying him should be excluded because it resulted from the illegal arrest. He also contended his presence at trial was unlawful because his identity and connection with the crime was a product of the unlawful arrest. The Supreme Court rejected both contentions. The court held the witness was not discovered by exploitation of the police misconduct and her in-court identification was a product of her own memory and not of the illegal arrest. The court also held the unlawful arrest did not prohibit the state from charging defendant and bringing him into court to be identified by the victim. In the case at issue, defendant's identity was discovered as a result of the unlawful search, but that did not deprive the state of the right to bring her to court nor the oportunity to prove her guilt through the introduction of evidence not tainted by the unlawful search. *United States v. Crews, supra.*

## II.   Testimonial Evidence

### 1.   *Helmuth Ferber*

From what we have just said, if the state's evidence is accepted, it follows that the court also erred in suppressing the testimony of Helmuth Ferber. Because the check was admissible, Helmuth Ferber would have been identified during the course of the investigation as the person who accepted the forged check. Since he allegedly took the check from defendant, he would naturally have been asked to attempt to identify her. Because the photographic lineup was admissible, Ferber's identification of defendant after he reviewed the lineup was also admissible. Defendant raises no issue concerning the photographic lineup itself, so that issue is not before us. The only issue is whether the use of the photograph of defendant was prohibited because of the unlawful search. Since we conclude it was not, the out of court identification testimony was admissible. Finally, because the out of court identification of defendant was admissible, it follows that the court also erred in suppressing the witness' in court identification. *United States v. Crews, supra.*

## 2.  *George Reiter and Donna Franks*

██ ██  The state argues that it was error to suppress the testimony of these two witnesses because their identities do not rest upon any "exploitation" of the illegal search or because they would also have inevitably been discovered.

As stated above, the state's evidence, if accepted, showed that the Safeway check would have been discovered by George Reiter in due course and turned over to the Eugene Police Department. Reiter's identity would then have become known. The state's evidence shows that routine interviews conducted during the investigation with Reiter revealed that he was acquainted with both Donna Sue Franks and defendant. Reiter testified at the hearing that defendant had worked as a bartender at the club and that Donna Sue Franks had applied for a job at the Columbus Club but that she had never been hired or issued any check drawn on the club's account. Reiter further testified that he knew Donna Sue Franks to be an acquaintance of defendant. Reiter also stated that only he and two others, including defendant, had access to the checks. Based on defendant's erratic work behavior, her access to the checks and her sudden termination of employment, Reiter stated defendant would have immediately come to mind as a suspect. Subsequent investigation would have led to Donna Sue Franks. Based on her information, defendant would have become the prime suspect. The state established by a preponderance of the evidence that both these witnesses would have been discovered, irrespective of the unlawful search.

In *State v. Johnson/Imel, supra,* we suggested that the better practice is for trial courts to incorporate factual findings in the order ruling on a motion to suppress or incorporate oral findings by a reference in the order. We also indicated there are some situations where detailed findings are unnecessary. In this case there are alternative bases for granting or denying the motion to suppress, and a determination of the historical facts would effect the ultimate decision. Because we cannot determine what facts the trial court used in arriving at its decision or upon what theory each witness or each piece of evidence was excluded, we remand for further proceedings. Specifically, on

remand, the court should issue a new decision incorporating findings of fact and a statement of the reasons for the ruling on each witness' testimony and each exhibit defendant seeks to suppress. In light of the legal principles discussed herein, the court may wish to reconsider its ruling.

Reversed and remanded for further proceedings.