Argued and submitted September 29, resubmitted In Banc December 1, 1983, affirmed
April 11, reconsideration denied July 13, petition for review allowed August 21, 1984
(297 Or 601)

STATE OF OREGON,
*Respondent,*

*v.*

JERRY LEE MILLER,
*Appellant.*

(C82-08-36632; CA A27112)

680 P2d 676

Stephen A. Houze, Portland, argued the cause and filed the brief for appellant.

Stephen F. Peifer, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

VAN HOOMISSEN, J.

Buttler, J., specially concurring.

Richardson, J., dissenting.

Gillette, J., dissenting.

## VAN HOOMISSEN, J.

Defendant appeals his conviction for manslaughter in the first degree. ORS 163.118. The case was tried to the court on stipulated facts following the partial denial of defendant's pretrial motion to suppress evidence. The issue is whether the trial court erred in denying part of defendant's motion. We affirm.

Shortly before midnight on August 6, 1982, defendant telephoned his brother in California and told him that he had just "strangled a kid."[1] The brother advised defendant to call a mental hospital or talk to someone who could help him with

---

[1] Defendant's brother testified, in relevant part:

"Q. (By Ms Johnson) Did he tell you what he'd done?

"A. Yes.

"Q. What did he say?

"A. He said he'd strangled a kid.

"Q. What was your response to that? Did you ask him, for example, how it happened?

"A. I didn't believe him was my initial response. Jerry did sound extremely depressed. Him and I talked on the phone quite a bit. I'd never heard him sound that way before. I asked him what did you say; are you sure?

"Q. What was his response?

"A. He said yes, he was sure. He didn't realize exactly what he'd done and when he realized that this young man wasn't breathing or moving he tried to give him mouth-to-mouth and revive him and that didn't work so he said he just sat there and looked at him for a while.

"Q. And then came and called you?

"A. Yes. He was in a hotel and he came from the hotel to a phone booth down the street, I guess, and called me from the phone booth.

"* * * * *

"REDIRECT EXAMINATION

"BY MR. HOUZE:

"Q. Mr. Miller, did your brother tell you in that conversation he did not do this intentionally?

"A. Yes, he did.

"Q. What did he say in that regard?

"A. He said he was having sex with this person and just suddenly realized that it happened and, you know, he felt remorse and kind of sorry and didn't know what, tried to bring the guy back with mouth-to-mouth resuscitation and it didn't work."

This testimony was elicited at a bail hearing. The parties stipulated that the trial judge could consider it in determining whether defendant was guilty.

his problem. Minutes later, defendant telephoned Dammasch State Hospital. He told Edna Smith, the receptionist, that he wanted to speak to a doctor. When she asked why, defendant answered, "Murder. I just killed a man!"

Smith dialed Dr. Saville, a psychiatrist. Then defendant's line disconnected. Smith immediately called the Clackamas County Sheriff's office. As she was relating what had happened, defendant telephoned Dammasch again. Smith spoke with him and asked for his telephone number, which he gave her. She then dialed Saville on another line. After explaining the situation, she asked Saville to keep defendant on the line until the sheriff could trace the call and locate him. Saville agreed to do so.[2] After connecting defendant with Saville, Smith gave his telephone number to the sheriff.

---

[2] Dr. Saville testified, in relevant part:

"[Smith] said there was a man on the phone who said he had murdered someone and the police wanted me to keep him on the phone until they could get to where he was.

"Q. (By Ms Johnson) You understood the call was going to be traced; is that correct?

"A. That's what I assumed, although she didn't tell me.

"Q. So what did you say?

"A. I said okay.

"Q. So what happened then?

"A. So she has to hang up. Then she rings me again so when I picked up the phone the second time I identified myself as I usually do. I said, 'This is Dr. Saville.' There was a man on the phone who said he had murdered someone.

"Q. What was your response?

"A. I said, 'How terrible. What happened?'

"Q. What did he say?

"A. He said that he had been having a homosexual encounter with someone and had strangled him.

"Q. Your response?

"A. I don't remember exactly what I said. It was shortly after that I asked him what his name was. At that point he said, 'Is this a confidential communication?' I said that it was.

"Q. And then did he give you his name?

"A. Yes.

"Q. What was the name?

Defendant and Dr. Saville conversed for several minutes until Officer Pritchard arrived at the telephone booth defendant was using. He had been informed by his dispatcher that the man using that telephone was talking to Dammasch State Hospital and had stated that he had just killed someone. Pritchard took the telephone from defendant, confirmed that he was talking to Saville and asked her to remain on the line. He then patted down defendant and found a wallet with identification. After placing defendant in the back seat of his police car, Pritchard talked briefly with Saville. She stated that she would have to check with her supervisor before divulging any information about her conversation with defendant. Later, she made a full report of the conversation to the police.

Pritchard asked defendant whether he had "hurt anyone." He replied that he wanted to see a lawyer. Pritchard nevertheless continued to question him. Defendant then stated that he *had* hurt someone, that "I just couldn't wake him up," and that the victim was in defendant's hotel room, which was nearby. Pritchard elicited those statements without first advising defendant of his *Miranda* rights. Defendant gave his room key to Pritchard, who ordered an ambulance sent to the hotel. He then went there, entered defendant's room without a warrant and found the victim's body.

Defendant moved to suppress (1) his statements to Smith and Dr. Saville; (2) his statements to Officer Pritchard; (3) evidence seized from his person; and (4) evidence obtained during the warrantless search of his hotel room. His motion also sought the suppression of derivative evidence. The trial court suppressed only his statements to Pritchard.

---

"A. Jerry Miller.

"Q. Now, your point in talking to him, were you anticipating that he would come into Dammasch as a patient?

"A. No.

"* * * * *

"A. I just wanted to keep him on the phone so the police could get there. That's all I was concerned with.

"THE COURT: You weren't attempting to - you're saying that to be more responsive to the question, you weren't trying to act in the role of giving him any psychotherapy at the time, or were you?

"THE WITNESS: No, that wouldn't have been appropriate."

Defendant first contends that the trial court erred in denying his motion to suppress evidence of his statements to Smith and Dr. Saville. He argues that those statements are protected by the "psychotherapist-patient" privilege. OEC 504.[3] OEC 504(1)(c) defines a "psychotherapist" as a person authorized to engage in, and in fact engaged in, the diagnosis or treatment of a mental or emotional condition. OEC 504(2) "limits the psychotherapist-patient privilege to communications made for the purpose of diagnosis or treatment, *i.e.,* consultation which is not part of diagnosis or treatment is not privileged." Kirkpatrick, Oregon Evidence 88, 90 (1981). The state argues that defendant's statements to Smith are not privileged, because they were not made to a person "reasonably necessary for the transmission of the communication." It argues further that Dr. Saville did not "diagnose or treat" defendant; she was simply keeping him on the telephone until the police located him. Therefore, no psychotherapist-patient relationship was established.

■■■ Statutory privileges are strictly construed. *State ex rel Calley v. Olsen,* 271 Or 369, 381, 532 P2d 230 (1975); *Triplett v. Bd of Social Protection,* 19 Or App 408, 413, 528 P2d 563 (1974); *see* 81 Am Jur 2d, *Witnesses* § 141. In *United States v. Nixon,* 418 US 683, 710, 94 S Ct 3090, 41 L Ed 2d 1039 (1974), the Supreme Court stated:

"Whatever their origins, these exceptions to the demand for every man's evidence are not lightly created nor

---

[3] OEC 504 provides in relevant part:

"(1) As used in this section, unless the context requires otherwise:

"(a) 'Confidential communication' means a communication not intended to be disclosed to third persons except: Persons present to further the interest of the patient in the consultation, examination or interview; persons reasonably necessary for the transmission of the communication; or persons who are participating in the diagnosis and treatment under the direction of the psychotherapist, including members of the patient's family.

"(b) 'Patient' means a person who consults or is examined or interviewed by a psychotherapist.

"* * * * *

"(2) A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purposes of diagnosis or treatment of the patient's mental or emotional condition among the patient, the patient's psychotherapist or persons who are participating in the diagnosis or treatment under the direction of the psychotherapist, including members of the patient's family."

expansively construed, for they are in derogation of the search for truth.''

In asserting the psychotherapist-patient privilege, defendant had the burden to show that both he and the nature of the evidence offered by the state were within the ambit of OEC 504. *See Groff v. S.I.A.C.,* 246 Or 557, 426 P2d 738 (1967); *State ex rel Juv. Dept. v. Madison,* 27 Or App 31, 33, 554 P2d 1022, *rev den* 276 Or 873 (1976).

OEC 504(1)(a) provides:

''* * * * *

"(a)   'Confidential communication' means a communication not intended to be disclosed to third persons except: Persons present to further the interest of the patient in the consultation, examination or interview; persons reasonably necessary for the transmission of the communication; or persons who are participating in the diagnosis and treatment under the direction of the psychotherapist, including members of the patient's family.''

Smith was not a person "participating in the diagnosis and treatment" of defendant; therefore, that clause is inapplicable. Similarly, she was not someone "reasonably necessary to the transmission of the communication"; that clause appears to refer to someone who assists a patient in directly communicating with a psychotherapist, for example, a translator.

If any of the clauses of OEC 504(1)(a) is applicable to defendant's communications with Smith, it is that which makes confidential communications disclosed to "[p]ersons present to further the interest of the patient in the consultation, examination or interview." The simplest parsing of this clause leads us to conclude that it is not applicable, either. The use of the word "present" in the clause shows plainly that it is intended to refer to persons who are physically present at the time and place a psychotherapist is conducting a consultation, examination or interview. That excludes Smith. Even assuming that defendant's communications to Dr. Saville were privileged, Smith took no part in that exchange. Her role ended when she put defendant in touch with Saville. We conclude that defendant's statements to Smith did not fall within the ambit of OEC 504, because those statements were

not "confidential communications." OEC 504(1)(a).[4] Smith's testimony was admissible.[5]

We also conclude that defendant's statements to Dr. Saville were not privileged. They were not "communications made for the purpose of diagnosis or treatment of [defendant's] mental or emotional condition * * *." Dr. Saville testified that as soon as she identified herself, defendant told her that he had been having a homosexual encounter with someone, and had strangled him. She also testified that she could not, would not and did not diagnose or treat defendant. She did not anticipate that defendant would come to Dammasch Hospital as a patient. She "just wanted to keep him on the phone so the police could get there. That was all [she] was concerned with." The trial court found that Dr. Saville was not engaged in the "diagnosis or treatment of a mental or emotional condition."[6] The record supports that finding, and

---

[4]The trial court found:

"The defendant told the telephone operator — who was not a psychiatrist's aide — that he had just killed someone and wanted to talk to a psychiatrist. He made an unsolicited confession that, at the time, was in no way related to any diagnosis or treatment of any mental illness.

"The statements made to the telephone operator were no more privileged than his confession over the telephone to his brother that he had just killed someone.

"The court rejects the argument of the defense that after the defendant's brother told the defendant to 'seek aid' that he was seeking consultation with a psychotherapist when he made the call to the hospital and that the telephone operator was a 'person reasonably necessary for the transmission of the communication' as defined in Rule 504(a)."

[5]The separate opinion of Richardson, J., in arriving at a contrary conclusion, regrettably concentrates on the "reasonably necessary" language of the clause in question and ignores the word "present." Even if it were correct in ignoring the pivotal word, however, we would nevertheless reject that opinion's conclusion because it is an unwarranted extension of the privilege. What if, in this case, defendant had personally contacted a gardner or a custodian on the Dammasch Hospital grounds, and that person had contacted Dr. Saville for defendant? Under the separate opinion's analysis, it seems necessary to conclude that statements made by defendant to the gardner or custodian would also be privileged. That is not a *strict* construction of the privilege. Boiled to its essentials, the separate opinion converts "reasonably necessary for" into "but for." The two are not the same.

[6]The trial court found:

"* * * There is no question that Dr. Saville, employed by Dammasch Hospital, was a psychotherapist as defined by the rule. However, at the time of her conversation with the defendant, she was not 'in fact engaged in the diagnosis or

we are bound by it. *Ball v. Gladden,* 250 Or 485, 487, 443 P2d 621 (1968).

Dr. Saville's representation that defendant's statements would be confidential is not controlling. First, *before* she said that, defendant had already admitted that he had strangled someone. Second, she testified that she could not, would not and did not diagnose or treat defendant over the telephone. Her only purpose in talking to defendant was to

---

treatment of a mental or emotional condition' as called for by the commentary on P. 89 Oregon Rules of Evidence, Butterworth, Inc. (1981). She was merely keeping the defendant talking so law enforcement officers could track him down and identify him. She had not established a psychotherapist-patient relationship and, although she promised the defendant to keep his confessions confidential, she had no legal duty to do so.

"There is a further and more fundamental reason why the disclosures made by the defendant must not shield the truth from disclosure for at the time the defendant was talking to the psychiatrist, it had not been established that he had actually killed someone, had attempted a murder, or had hurt someone. He said he couldn't arouse the victim. He later admitted to the police had had 'hurt' someone. An emergency ambulance was dispatched and requested by the police to proceed as quickly as possible.

"There are hundreds and probably thousands of cases where unconscious strangled persons are aroused by emergency measures. According to Dr. Alfred Freedman, past president of the American Psychiatric Association, 'an immediate threat to someone overrides the necessity of confidentiality.' 24 Clev State L Rev 393 (1975).

"According to Professor of law and psychiatry, Ralph Slovenko, the therapist-patient relationship supports affirmative duties not only to the patient, but also for the benefit of third parties. A psychiatrist's loyalty to his patient and his responsibility for treating the professional relationship with respect and honor does not negate his responsibilities to third persons, to the rest of the profession and to science. 24 Clev State L Rev 395 (1975). He quotes Dr. Menninger, who says, that if a patient tells a doctor in confidence that he has brought a time bomb into the hospital and hidden it under the bed of one of the patients, it would be a strange doctor indeed who would feel that his professional confidence should not be violated. Here, the possibility of saving a human life was at stake. The psychiatrist had a professional duty to act as she did.

"As one of the so-called authors of the new Oregon Evidence Code, P. vii Introduction to Oregon Evidence Code, (Butterworth, Inc. 1981), I can only state that it was the drafters' intention only to extend privileges to the extent absolutely necessary for the carrying out of professional relationships, and no further.

"The rule contemplates an established psychiatrist-patient relationship — agreed upon by both sides — and protection of those confidential communications made in actual treatment or for diagnosis. In no way did the drafters intend the rule to be perverted to cover an unsolicited call from a non-patient to a state hospital who confesses a criminal wrongdoing of assualt or homicide not related to diagnosis or treatment. Accordingly, the court holds that any statements made by the defendant to the telephone operator or Dr. Seville are not protected by the therapist-patient privilege. * * *."

keep him on the telephone while the police tried to locate him and possibly rescue his victim. While she initially thought that her profession's ethical standards demanded confidentiality, she later made a full disclosure to the police. Third, the fact that defendant may have thought that his statements were privileged did not make them privileged.[7] *See Hoffa v. United States,* 385 US 293, 302, 87 S Ct 408, 17 L Ed 2d 374 (1966). Construing the statute *strictly,* we agree with the trial court that no psychotherapist-patient relationship was established.

■ Even assuming that defendant's communications to Dr. Saville were privileged and that it was error to admit the evidence, we conclude that any error was harmless. *See Chapman v. California,* 386 US 18, 87 S Ct 824, 17 L Ed 2d 705 (1967); *State v. Naylor,* 291 Or 191, 629 P2d 1308 (1981). Before contacting Dammasch, defendant telephoned his brother and told him that he had just "strangled a kid" during a homosexual relationship. Shortly thereafter, he telephoned Dammasch and told Edna Smith, "Murder. I just killed a man!" Thus, Dr. Saville's testimony that defendant admitted the homicide was merely cumulative of evidence already before the trier of fact.[8]

■ Defendant next contends that his statements to Smith and Dr. Saville should be suppressed because they are "constitutionally involuntary," and because they were obtained as a result of the unlawful invasion of his right of privacy. We agree with the trial court that defendant's statements to the receptionist and psychiatrist were made voluntarily in conversations that he initiated. We find no merit in defendant's constitutional arguments. *See State v. Bonner,* 49 Or App 849, 853, 621 P2d 87 (1980).

■ Defendant contends that the trial court erred in denying his motion to suppress physical evidence obtained after his admittedly *Miranda*-violative statements to

---

[7]Defendant did not testify at trial. There is no evidence in the record that he relied on Dr. Saville's representation.

[8]Defendant was charged with murder. ORS 163.115. He was convicted of the lesser included offense of Manslaughter In The First Degree. ORS 163.118. Arguably, Saville's testimony may have helped defendant more than it may have hurt him in that it substantially negated the state's contention that he had *intentionally* killed his victim, thus permitting the judge to convict on the lesser included offense.

Officer Pritchard. The trial court suppressed evidence of defendant's statements to Pritchard. However, the court found that defendant's wallet, identification and keys were properly seized incident to a lawful arrest.

Excluding defendant's statements that were suppressed by the trial court, Pritchard knew, when he arrested defendant, that moments earlier a man had admitted over the telephone to Dammasch State Hospital personnel that he had killed somebody. Within minutes the police had traced that call to a specific telephone. Pritchard found defendant using that telephone, and Pritchard confirmed that the party on the line was Dr. Saville, a Dammasch psychiatrist. Under the circumstances, Pritchard had probable cause to believe that defendant was the man who had just admitted to Dammasch personnel that he had killed somebody. He had probable cause to arrest defendant and to search him incident to the arrest. *See State v. Heintz,* 286 Or 239, 594 P2d 385 (1979); *State v. Cloman,* 254 Or 1, 456 P2d 67 (1969); *State v. Corona,* 60 Or App 500, 655 P2d 216 (1982).

We reject defendant's argument that the search was improper under *State v. Caraher,* 293 Or 741, 653 P2d 942 (1982). The trial court stated:

"Having argued with great tenacity and persuasiveness that the defendant was in custody for *Miranda* purposes and prevailing on this point, the defendant must now accept the bitter with the sweet. Accordingly, the court holds that the wallet and keys seized by Officer Pritchard were pursuant to a lawful custodial arrest and were, therefore, lawfully seized."

We agree. *See State v. Groda,* 285 Or 321, 591 P2d 1354 (1979).

■■ Defendant last contends that the trial court erred in failing to suppress evidence seized during the warrantless search of his hotel room. The state argues that the evidence was admissible under the "inevitable discovery" rule.[9] *See* ORS 133.683. We agree.[10]

Affirmed.

___

[9]The trial court found:

"* * * the court nonetheless feels that a discussion of the inevitable discovery doctrine is also appropriate. Because the application of the doctrine of inevitable discovery would allow the state in the instant case to offer evidence that might otherwise be inadmissible, the court will outline its reasoning in some detail. *State v. Johnson/Imel,* 16 Or App 560, *rev denied* on Imel (1974).

"The doctrine is a theoretical formulation of the law of search and seizure that permits the prosecution to purge the taint of illegally obtained evidence by proving, by a preponderance of the evidence, that such evidence would have inevitably been discovered, absent the illegality, by proper and predictable investigatory procedures. The doctrine may be said to have its logical root in the 'independent source' exception to the exclusionary rule first announced in *Silverthorne Lumber Co. v. U.S.*, 251 US 385 (1920). The inevitable discovery doctrine can be viewed as a natural extension of the independent source exception to the exclusionary rule. This exception was codified in Oregon in 1973 in ORS 133.683, and has been recognized in various Oregon cases. See *State v. Hacker*, 51 Or App 743 (1981) and cases cited therein.

"The modern form of the doctrine arose in a homicide case in the United States Court of Appeals for the District of Columbia. In *Wayne v. U.S.*, 318 F2d 205, 209 (D.C. Cir), *cert. denied*, 375 US 860 (1963), Chief Justice, (then Judge) Warren Burger stated:

" '[I]t was inevitable that, even had the police not entered appellant's apartment at the time and manner they did, the coroner would sooner or later have been notified by the police of the information reported by the sister (of the victim), and would have obtained the body and would have conducted the post mortem examination prescribed by law.'

"The court followed the doctrine again in *Killough v. U.S.*, 336 F2d 929 (D.C. Cir 1964).

"I think that in the instant case, it is fair to say that even had Officer Pritchard not entered defendant's hotel room at the time and in the manner he did, within forty-eight hours, the maid would have lawfully entered the room to clear, as was the hotel's custom and policy; the authorities would have been advised and the body of the victim would have been brought to the custody of the state. This discovery would ultimately have led to the discovery of the identity of the room's renter alleged by the state to be the defendant. (The defendant had apparently registered under his actual name.)

"The defendant urges a theory that but for Officer Pritchard's conduct, the defendant would have slipped back to the hotel, packed up the victim's body, surreptitiously removed the body from the hotel, disposed of same, and concealed the crime. The court finds this theory inconsistent with the evidence thus far presented at the various pretrial hearings. The facts disclosed that the defendant shortly after the victim's death: 1) called his brother in California and confessed the facts of the incident, including the fact that the defendant believed he had killed someone; 2) called Dammasch Hospital and related details of the incident to both Edith Smith and Dr. Saville candidly admitting that he believed he had killed someone in a homosexual act; 3) provided Dr. Saville with the telephone number of the telephone booth from which he called Dammasch Hospital; and 4) remained in the telephone booth. The court has heard no testimony which indicates that the defendant planned to attempt to remove the body or make any effort to conceal its discovery from the police.

"The threshold inquiry is the nature of the investigation the police would be expected to perform under the facts and circumstances of this particular case. Applying the doctrine, the court finds that after the discovery of the body by the maid and notification of the police, a 'standard operating procedure' would have been a routine check of the hotel's records, which inevitably would have revealed the defendant's identity. See *People v. Chapman*, 261 Cal App 84 (1965). See also *Bartram v. State*, 364 A2d 1119, 1151 (Md Ct App 1976) (Police would have discovered 'the mysterious other woman lurking in the background of a bizarre homicide'.)

"The court further notes that special homicide detectives routinely would have been assigned to this case after discovery of the body and that these detectives would have uncovered the disputed evidence absent the illegality. Logic would seem to indicate that specialized expertise or experience on the part of a particular elite investigative body, such as a homicide unit, is relevant in predicting the nature and scope of the investigation.

"The court also finds that a private citizen, such as the maid here, would reasonably be expected to report finding a body, as in *Killough v. U.S.*, supra. The evidence presented to the court indicates that the defendant rented the hotel room on a Monday for a period of two weeks. Hotel personnel testified that the rooms were cleaned every seven (7) days, and therefore, the court can conclude that on the following Monday, some forty-eight to 56 hours after the defendant called Dammasch, the maid would have entered the room in question.

"In an analogous fact situation in *People v. Soto*, 55 Misc. 2d 219, 285 NYS 2d 166, Appeal Dismissed, 27 NY 2d 735 (1970), the defendant, after fatally stabbing the victim, deposited the murder weapon in a post office box. When arrested, the defendant confessed to the crime and directed police to the mailbox where the knife lay hidden. The trial court held that the confession was inadmissible, but admitted the knife on the basis of its prediction that the weapon would have been found the next day by a postman scheduled to empty the mailbox. The court concluded that the postal authorities would have turned the knife over to the police for further investigation, and it was inevitable that the police would have found the incriminating evidence without the defendant's direction. Id at 221.

"The court finds that the maid in the instant case would normally be expected to come forward and co-operate with police authorities. See *Commonwealth v. White*, 311 NE 2d 550, 552 (Mass 1972) (The court refused to suppress the testimony of witnesses [crime victims who had reported the robberies to police] which was derived solely from the defendant's tainted confession. The court based its decision on a finding that 'the identity of the victims would probably have been discovered by the police and associated with the defendant irrespective of his statement.') Cf. *Lockridge v. Superior Court*, 3 Cal 3d 166, 474 P2d 683 (1970).

"Also relevant to a determination of inevitability is the question of the physical properties of the evidence particularly a consideration of its potential destructibility. The *Killough* court noted that even a decomposed body could be scientifically identifiable for a considerable period of time. In the instant case, the body would have been found prior to any significant decomposition, identification obtained from fingerprints (as was done), and relevant pathological evidence readily obtainable.

"The court concludes, after weighing all of the facts presented, that in the instant case * * * the application of the 'inevitable discovery' standard will allow the prosecution an opportunity to untaint reliable evidence without doing violence to the teachings of *Wong Sun*. The evidence obtained herein through improper search and seizure and Miranda defects is uniquely probative. The character of the physical evidence is not altered by the ·circumstances of the acquisition. See *Oaks, Studying the Exclusionary Rule in Search and Seizure*, 37 U Chi L Rev 665, 737-38 (1970). Thus, the application of the exclusionary rule in this case would be especially vulnerable to Justice (then Judge) Cardozo's often quoted retort in *People v. Defore*, 242 NY 13, 150 NE 585, Cert. Denied, 270 US 657 (1926):

" 'The criminal is to go free because the constable has blundered. . . . A room is searched against the law, and the body of a murdered man is found. . . . The privacy of the home has been infringed, and the murderer goes free.'

**BUTTLER, J.,** specially concurring.

■ Although I agree with Richardson, J., that defendant's statements to Dr. Saville were privileged communications within the meaning of OEC 504 and should have been excluded, I agree with the majority that, in the peculiar context of this case, the error was harmless. Accordingly, I concur in the affirmance of defendant's conviction.

Young, J., joins in this specially concurring opinion.

**RICHARDSON, J.,** dissenting.

■ I would hold that defendant's statements to the psychiatrist and to the Dammasch receptionist are privileged under OEC 504, and I therefore dissent.

The majority does not appear to dispute—and could not—that defendant's objective in calling the hospital was to obtain professional assistance from a psychiatrist. The majority also acknowledges that the psychiatrist represented to defendant that his communications were confidential. The responses the majority makes to those significant facts are that the doctor's representation of confidentiality "is not controlling" and that "the fact that defendant may have

---

"Clearly, the Supreme Court in *Brewer v. Williams,* 430 US 387 (1977), intended the doctrine to apply in cases such as the instant one. Accordingly, based upon all the facts and evidence presented to the court at the various pretrial hearings, the court concludes that inevitable discovery of the victim's body, and the evidence flowing from it, would have occurred notwithstanding the initial illegal conduct of the police."

Defendant argues that the state may not invoke the inevitable discovery rule, because "the police acted in bad faith with respect to the primary illegality." *See State v. Hacker,* 51 Or App 743, 751, 627 P2d 11 (1981). Whether or not the trial court's ruling carried with it an implicit finding that no bad faith was involved, our review of the record satisfies us that the primary motivation of the officer was to locate a victim of recent violence and to render any aid possible. Defendant argues that the only information available to the officer was that the victim was beyond aid. At least for purposes of the bad faith exception to the inevitable discovery rule, law enforcement officials are not precluded from offering potentially life-saving support merely because a person has told them that a victim is dead.

[10]Because the evidence was admissible under the inevitable discovery rule, we need not consider the state's contention that the evidence was also admissible under the "emergency exception" to the warrant requirement, *see State v. Davis,* 295 Or 227, 666 P2d 802 (1983), or under the "rescue doctrine," *see People v. Krom,* 61 NY 2d 187, 473 NYS2d 139, 34 Cr L Rptr 2437 (1984); *People v. Modesto,* 66 Cal 2d 695, 59 Cal Rptr 124, 131, 427 P2d 788, *cert den* 389 US 1009 (1967); *People v. Riddle,* 83 Cal App3d 563, 148 Cal Rptr 170 (1978), *cert den* 440 US 937 (1979); *but see People v. Manning,* 672 P2d 499 (Colo 1983).

thought that his statements were privileged did not make them privileged." It is true that neither the psychiatrist's assurance nor defendant's misplaced reliance establishes conclusively that his communications to the psychiatrist were privileged. However, the facts that defendant sought confidential professional services and that the psychiatrist purported to be rendering them seem to me to be the starting point of and what gives rise to our inquiry; it is simply insufficient to treat those facts as inconsequential, because they do not end the inquiry.

The majority also says that the

"* * * trial court found that Dr. Saville was not engaged in the 'diagnosis or treatment of a mental or emotional condition.' The record supports that finding and we are bound by it." 67 Or App at 644-45. (Citation omitted; footnote omitted.)

In that context, as in others, the majority confuses questions of fact and questions of law. There is no significant dispute about the relevant facts. Whether the doctor was engaged in "diagnosis or treatment of [defendant's] mental or emotional condition" within the meaning of OEC 504 under the facts found by the trial court is a legal issue, and it is immaterial to the scope of our review that the trial judge attached statutory terminology to his fact findings. *See* 67 Or App at 644-45, n 6.

With the foregoing as prologue, I turn to an examination of what happened here. The psychiatrist testified that her reason for speaking with defendant was to keep him occupied until the police located him. However, the relevant point is not *why* she spoke with him, but whether the *substance* of the conversation came within the privilege defined by OEC 504. This was not a situation in which the psychiatrist *told* defendant that she did not understand their conversation to be related to her professional role, or one in which she listened in silence while defendant spoke, or even one in which she simply engaged in polite chatter and offered comforting reassurances. She spoke with defendant in the basic way she would speak with a patient in a diagnostic or treating situation. She testified:

"Q. [Defendant's Attorney] During this conversation the duration of which you said is ten or fifteen minutes, it is true,

is it not, that you went into a great deal of background information with Mr. Miller?

"A. That seemed to be the safest thing to talk about.

"Q. And is it true that you developed what might be called the basic background information in a psychiatric interview? Where were your born? What do you do for a living, other pertinent items of information?

"A. Some. I got some information from him. Not by any stretch of the imagination was it complete.

"Q. I didn't say it was complete. It was basically background, similar to what you obtain from your training in a psychiatric interview?

"A. Yes."

In addition, the psychiatrist spoke with defendant about his reasons for the killing, about his "having fantasies about a situation [when] someone was killed during a homosexual act" and about other matters germane to defendant's actions and his feelings.

The psychiatrist indicated that, although Dammasch does not provide outpatient treatment, psychiatric counseling is *sometimes* provided by telephone to persons who call because they are upset or have a problem. She also testified in effect that she did not consider herself to be acting in a psychotherapeutic role, that she did not expect an ongoing psychiatrist-patient relationship to develop and that there were differences between the approach she would follow with a patient and the approach she followed with defendant. However, none of that goes to the point.

Whether or not the psychiatrist regarded defendant as a present or prospective patient, she used her professional methodology in her conversation with him. Even assuming the correctness of the state's propositions that the privilege cannot arise except when there is a consensual treating or diagnostic relationship and that *defendant's* subjective understanding that the conversation was privileged is insufficient in itself to create a privileged relationship, it does not follow that the *psychiatrist's* subjective understanding of the purpose of the conversation made it *non-privileged.* A patient who has been assured of confidentiality and who has participated in what is in fact a psychiatric interview cannot be denied the benefit of the privilege simply because the psychiatrist regards

the exercise as secondary to some other objective of which the patient is unaware. Summarily stated, the doctor perceived her objective to be to keep defendant on the phone rather than to act as his psychiatrist, but the way she achieved that objective was by acting as his psychiatrist.

The state argues:

"Even assuming, *arguendo,* that defendant's conversations with the Dammasch personnel qualified as privileged material, the emergency circumstances at hand fully justified the overriding of that privilege. Professionals, like anyone else, have moral and ethical responsibilities to assist third parties in life-threatening situations. * * * Defendant reported ongoing criminal behavior to [the psychiatrist] and [the receptionist], and they had no way of knowing whether the victim of defendant's 'murder' was dead or alive. People who appear dead to the layperson frequently are resuscitated by trained medical personnel. The psychiatrist and the operator did what they were ethically bound to do under the circumstances. As the trial court noted, the need to save a life superseded the confidentiality of any purported privilege." (Citations omitted.)

I agree that psychiatrists can have and that the doctor here may have had an ethical obligation that was in conflict with and prevailed over the obligation to maintain the confidentiality of privileged communications. However, the issue is whether any prospective *evidentiary use* can be made of defendant's statements, not whether the psychiatrist's *past* actions violated the privilege or were justified. If, as I conclude, defendant's statements were made on a privileged occasion, there is no authority or logical basis for concluding that the psychiatrist's disclosure of the statements to meet a moral duty to the victim could constitute a waiver of the evidentiary privilege by defendant.

The majority states that "[s]tatutory privileges are strictly construed." I do not disagree with that abstraction. However, the majority's conclusion that defendant's statements to the psychiatrist are not privileged is not a strict construction of OEC 504. It is a judicial repeal.

I also disagree with the majority's conclusion that defendant's statements to the hospital receptionist are unprotected by OEC 504. The receptionist testified that defendant's initial statement to her when she answered the phone was that he wanted to speak with a doctor. Only after

she asked him what the problem was did he tell her what he had called to discuss and later did consult the psychiatrist about. The receptionist also testified, in effect, that she routinely screens unsolicited telephone calls before putting them through to the psychiatrist on duty. The receptionist's testimony was uncontroverted, and defendant could have had no more reason at the time they talked than a factfinder could have now to believe that giving the message to the receptionist was not a "reasonably necessary" precursor to communicating directly with the psychiatrist. Moreover, neither defendant nor a factfinder could reasonably think that the psychiatrist or her superiors had not authorized the receptionist to elicit the communication that defendant intended to make to the psychiatrist herself. The psychiatrist did not differ in that respect from other professional persons whose clients' and patients' communications are protected by the evidentiary privileges. The simple fact is that few doctors or lawyers answer their own phones.

Historically, there has been a division of authority about whether, to what extent and under what circumstances confidential communications made to or in the presence of agents and assistants of professional persons are insulated against evidentiary disclosure. *See* McCormick, Evidence (2d ed 1972), §§ 91, 101; *Annot.,* 47 ALR2d 742 (1956). However, when a privilege statute expressly includes communications heard by or made to persons associated with the doctor, lawyer or other privileged consultant, a restrictive view of evidentiary protection for confidential communications to the consultant's assistants is untenable. *See* McCormick, Evidence, *supra,* §101; *Ostrowski v. Mockridge,* 242 Minn 265, 65 NW 2d 185, 47 ALR2d 733 (1954). OEC 504(1)(a) specifically provides that, under certain circumstances, confidential communications to persons other than a psychotherapist are insulated from disclosure.

The evidence was uncontroverted that defendant *could not* have communicated *anything* to the psychiatrist, unless he first told the receptionist what he wanted to tell the doctor. His communication to the receptionist was "reasonably necessary for [its] transmission" to the psychiatrist, and it was therefore privileged under the statute. The majority criticizes the reasoning that leads me to that conclusion and

states that my opinion "regrettably concentrates on the 'reasonably necessary' language of the clause in question and ignores the word 'present.' " 67 Or App at 644, n 5. There is a good reason for ignoring the word "present": it is *not* part of the clause in question. The *relevant* clause of OEC 504(1)(a) says nothing about persons present when a communication to a psychiatrist is made, but refers to "[p]ersons reasonably necessary for the transmission of the communication"; the word "present" appears in the preceding clause, which has nothing to do with the quoted one and nothing to do with this case. The majority also suggests that, under my reasoning, a confession to the gardener at Dammasch would be privileged. The answer to that *reductio ad absurdum* is that, unlike the receptionist, nothing in this record suggests that a gardener was systematically placed so that no communication could be made to the psychiatrist before the gardener was made aware of its substance.

Because I consider that the communications to *both* the psychiatrist and the receptionist were privileged, it is unnecessary for me to address in detail the majority's conclusion that, if the admission of the *psychiatrist's* testimony was error, the error would be harmless, because the testimony "was merely cumulative of" the testimony of the receptionist and other evidence. However, the majority's secondary reason for finding the error harmless does require some comment. It says:

> "* * * Defendant was charged with murder. ORS 163.115. He was convicted of the lesser included offense of Manslaughter In The First Degree. ORS 163.118. Arguably, Saville's testimony may have helped defendant more than it may have hurt him in that it substantially negated the state's contention that he had *intentionally* killed his victim, thus permitting the judge to convict on the lesser included offense." 67 Or App at 646, n 8. (Emphasis in original.)

The reason defendant sought to have the psychiatrist's testimony and other evidence suppressed was to avoid being convicted of *anything*. The psychiatrist's testimony was strong evidence that defendant was guilty of homicide. Although the standards for determining whether error is prejudicial are varied and have been articulated in various ways, the majority is *indeed* innovative in concluding that the

erroneous admission of evidence is harmless to a criminal defendant if it results in nothing worse than his conviction of a lesser included offense.

Joseph, C. J. and Newman, J., join in this dissent.

**GILLETTE, J.,** dissenting.

While I agree with much of what the majority holds, I disagree on the pivotal question of the psychiatrist's testimony. I agree with the separate dissenting opinion of Richardson, J., that that testimony was inadmissible. As to the majority's alternative conclusions that the evidence was either cumulative or harmless, I note the following:

1. The word "cumulative" should not even arise in this case. The psychiatrist's testimony is different and more complete than other accounts. There is nothing "cumulative" about it.

2. The majority holds that, in any event, the psychiatrist's testimony was harmless because it may have *helped* defendant. 67 Or App n 8 at 646. This is akin to saying, "You can't complain, because the fellow who tried to kill you just severely wounded you, instead." This error was not harmless.

Defendant's conviction should be reversed.[1]

I respectfully dissent.

---

[1]I decline to join in the separate dissent of Richardson, J., because I believe its treatment of the receptionist's testimony to be wholly unwarranted and, indeed, an awful extension of the privilege involved.