Argued and submitted September 25, 2002, affirmed January 29, 2003

# STATE OF OREGON,
## *Respondent,*

*v.*

# PAUL MARCEL MITUNIEWICZ,
## *Appellant.*

## 980433474; A108356

62 P3d 417

Robin A. Jones, Senior Deputy Public Defender, argued the cause for appellant. With her on the briefs was David E. Groom, Acting Executive Director, Office of Public Defense Services.

Janet A. Klapstein, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Landau, Presiding Judge, and Deits, Chief Judge, and Brewer, Judge.

BREWER, J.

## BREWER, J.

Defendant appeals from his convictions for manufacture, distribution, and possession of a controlled substance. ORS 475.992. He assigns error to the trial court's denial of his motion to suppress evidence of a marijuana growing operation that the police found at his residence when they executed a search warrant. Defendant contends that the police discovered the evidence in violation of his protected privacy interests under Article I, section 9, of the Oregon Constitution by exploiting information gained from an illegal trap and trace device placed on the telephone of an agricultural products supplier. Because the relevant facts are undisputed, we review for errors of law. ORS 138.220. We affirm.

In February 1995, the City of Portland organized the Marijuana Task Force (MTF) to investigate a business called American Agriculture[1] and its owner, Martin. American Agriculture supplies grow lights and other equipment used for indoor gardening. Officers assigned to MTF believed that Martin and American Agriculture were engaged in a criminal conspiracy with customers by providing them with equipment, assistance, and advice about growing marijuana. Before the formation of MTF, the Drugs and Vice Division of the Portland Police Bureau had conducted approximately 50 investigations of American Agriculture customers. Of those investigations, only one had uncovered a customer who used the equipment for legitimate purposes.

To obtain evidence of a conspiracy, MTF Officer Shropshire applied to the Multnomah County Circuit Court for an order to place a trap and trace device on American Agriculture's telephone. A trap and trace device identifies the originating telephone number of incoming calls, similar to a "Caller ID" box but without the knowledge of either party to the calls. ORS 165.657(4). Shropshire's affidavit in support of the 1995 application recited information gained from a "confidential reliable informant" (CRI). According to the affidavit, the CRI had relayed to Shropshire a number of facts, including that Martin had been involved in the manufacture of

---

[1] American Agriculture was previously known as Halide of Oregon. For convenience, we refer only to the current name.

marijuana plants before 1995; that the CRI had had numerous conversations with Martin regarding the manufacture of marijuana, during which Martin had disclosed that he was aware that "the major portion" of his customers used the equipment sold at American Agriculture to grow marijuana; that Martin had prepared a list of marijuana growers in the Portland metropolitan area that he intended to use as a plea bargaining tool should he ever be prosecuted; that Martin knew that the police had been investigating him for years but felt that he was "invincible" to prosecution for conspiracy; that Martin had assisted some of his favorite customers by making personal deliveries so they could avoid being seen at the store by police; that other customers used United Parcel Service (UPS) to avoid coming to the store; that Martin had developed a nutrient system for growing marijuana hydroponically and had tested it by giving it to six other people for comparison purposes; and that the CRI had been present when other marijuana growers called American Agriculture seeking technical advice. On February 9, 1995, the court issued the trap and trace order.

After the trap and trace was installed, MTF officers obtained the names and home addresses of subscribers to the telephone numbers trapped by the device. Because the lights used for indoor marijuana growing operations draw considerable power, MTF officers obtained, by subpoena, power records for each of those residences. Reviewing the records, the officers identified homes with abnormally high power consumption. They then went to each of those homes to conduct a "knock and talk" investigation, in which they asked the occupants for permission to search the premises. Officers searched a number of residences, either with the consent of the occupants or after returning with warrants that were issued on the basis of the power records and other information obtained during the knock and talks. MTF's stated purpose was to locate and arrest marijuana growers who might testify about a conspiracy involving American Agriculture and Martin. The Multnomah County Circuit Court trap and trace order was extended on March 9, 1995, but it expired without further extension 30 days later, on April 7, 1995.[2]

---

[2] A trap and trace order obtained under Oregon law is effective for 30 days and may be extended, also by court order, for an additional 30 days. ORS 165.667(2)(f).

On June 22, 1995, MTF, with the cooperation of a federal investigator, obtained a federal trap and trace order, followed by a series of extensions.[3] In approximately August 1996, a federal prosecutor reviewed all of the information that had been obtained under the federal and state orders. By then, MTF had seized 394 marijuana growing operations and had arrested 531 suspects. According to Shropshire's affidavit, most of the seizures were "a direct result of information received from the use of the trap and trace device." However, those seizures yielded only one suspect who provided information implicating Martin in a conspiracy. That informant stated that, in 1985, Martin told him that he had started the business to supply equipment so that he and his friends could grow marijuana, but he began selling on a retail basis when he realized that there was a great demand for the equipment, which was profitable in its own right. The informant also stated that Martin had sold him marijuana "clones" (plant cuttings). Despite that information, the federal prosecutor declined to submit the case against Martin to a grand jury, opining that the evidence was not sufficient to win a conviction. She also recommended discontinuing the federal trap and trace order, and MTF did not seek any further extensions of that order. The federal order expired on August 13, 1996.

Between August 13, 1996 and March 8, 1998, there was no trap and trace device in place at American Agriculture. During that period, MTF continued its investigation using other methods. On March 9, 1998, Shropshire again applied for a trap and trace order from the Multnomah County Circuit Court. In his supporting affidavit of the same date, Shropshire repeated the information given by the original CRI and enumerated the seizures and arrests that had resulted from the earlier uses of the trap and trace. He also noted that other investigations had revealed that customers who paid American Agriculture with a credit card or a personal check were given receipts that falsely showed that they had paid cash for merchandise. He opined that, in addition to those marijuana growers previously arrested, American Agriculture had other customers who were growers and that,

---

[3] A federal trap and trace order is effective for 60 days and may be extended for additional 60-day periods. 18 USC § 3123(c).

if arrested, those growers "may share information with law enforcement that would be beneficial to the successful prosecution of [Martin] and/or civil remedies against the business of American Agriculture." He also stated that MTF had conducted surveillance of several other businesses in the Portland area that sell the same type of equipment and that "none of them seem to attract the business of those who are inclined to manufacture marijuana as much as the business of American Agriculture." Finally, Shropshire stated that, within the past two years, "representatives of American Agriculture" had acknowledged to a city attorney that some of its customers purchased equipment for the specific purpose of growing marijuana.[4]

Shropshire's affidavit did not disclose the federal prosecutor's opinion that the previously gathered evidence did not support prosecution. The affidavit also did not reveal that, on more than one occasion, an informant wearing a "body wire" was sent into American Agriculture but was ordered to leave the store immediately after mentioning an intent to use the company's equipment for growing marijuana. It also did not disclose that MTF had placed a pen register on Martin's home telephone line that failed to produce any evidence. *See* ORS 165.657(2) (defining "pen register" as a device that records numbers dialed from the telephone line to which it is attached). The affidavit also erroneously stated that the earlier trap and trace operation had not yielded any new informants.[5]

Based on the affidavit, the magistrate authorized reinstallation of the trap and trace device. The device trapped defendant's phone number. MTF then subpoenaed power consumption records for defendant's home. Those records revealed that defendant's power consumption was about three times higher than that of the previous resident.

---

[4] That acknowledgment apparently took place during negotiations pursuant to a defamation lawsuit that American Agriculture had filed against the City of Portland. The suit ended in a settlement in which the city agreed, among other things, not to use informant agreements that offered consideration to individuals in return for providing information about American Agriculture.

[5] Because Shropshire did not disclose the existence of the informant who was identified as a result of the federal trap and trace, the issuing magistrate could not have known about that person. Thus, in considering the lawfulness of the 1998 order, we do not consider the information that the informant gave to MTF.

On April 6, 1998, three MTF officers went to defendant's house to conduct a "knock and talk." Officer Schmautz told defendant that the police had information that he was growing marijuana and asked defendant to consent to a search of his residence. Defendant declined to consent and also denied the officers permission to walk around the outside of the premises. While standing on defendant's front porch, Schmautz smelled the odor of marijuana coming from the house. He arrested defendant. After the officers transported defendant to jail, they obtained a warrant to search the house. When told that a warrant had been issued, defendant stated that he was growing marijuana in the basement so that he could pay previously accrued hospital bills. The officers returned to the house and discovered 307 marijuana plants in various stages of growth.

Before trial, defendant moved to controvert the search warrant and to suppress the evidence found at his residence, contending, among other arguments, that the warrant was based on his refusal to consent to search and that the police investigation of his power records violated his right to privacy. Because the trap and trace operation was ongoing, neither MTF nor prosecutors had disclosed its existence; thus, defendant did not challenge the lawfulness of the trap and trace operation. The trial court denied defendant's motions and, after a stipulated facts trial, convicted him of manufacture, possession, and delivery of a controlled substance.

After trial, but before sentencing, defendant's counsel learned that the MTF investigation of defendant had originated with the 1998 trap and trace order. Defendant moved to amend his motion to suppress and to reopen the suppression hearing. The trial court granted that motion. After a hearing, the court ruled that MTF's application for the 1998 order was insufficient to support a trap and trace order because the information provided by the CRI and the informant developed as a result of the federal trap and trace was too stale to furnish probable cause to believe that a conspiracy existed in 1998.[6] It further reasoned that the increasing number of seizures that did not produce informants showed that

---

[6] The trial court considered the information from the second informant because it was relevant to other cases consolidated for the suppression hearing. As noted, that information is not relevant to our consideration of this case.

an ongoing conspiracy did *not* exist, so that probable cause was lacking to believe that a new trap and trace order would yield evidence of a continuing conspiracy. The court concluded that the violation of the trap and trace statutes infringed defendant's protected privacy interests under Article I, section 9. Nevertheless, the court held that suppression was not warranted because, even though defendant came to the state's attention by virtue of the trap and trace operation, the police had not exploited the unlawful 1998 order. The court found that MTF officers did not use their knowledge of telephone calls to American Agriculture either in seeking consent to search or in applying for a search warrant. It held, therefore, that the affidavit in support of the warrant to search defendant's house demonstrated probable cause independently from the evidence derived from the trap and trace order.

On appeal, defendant argues that the trial court erred in concluding that the police did not exploit the unlawfully obtained information; he asserts that the evidence derived from it is "fruit of the poisonous tree."[7] The state responds that the 1998 trap and trace order was supported by probable cause and, thus, was lawful.[8] Alternatively, the state argues that, even if the order was unlawful, (1) the police did not exploit any information derived from it; (2) defendant's power consumption and the odor of marijuana at his home independently established probable cause for the search warrant; and (3) at most, the police violated defendant's statutory rights, not his constitutionally protected privacy interests and, thus, suppression is not an available remedy. ORS 136.432.[9]

---

[7] Defendant also argues that he had a heightened privacy interest in the area of the front door of his residence. We reject that argument without discussion. *See State v. Ohling*, 70 Or App 249, 253, 688 P2d 1384, *rev den*, 298 Or 334 (1984) ("[Officers' act of g]oing to the front door and knocking was not a trespass.").

[8] The state also asserts that, in determining that the order was unlawful, the trial court improperly focused solely on past criminal conduct rather than future offenses. *See* ORS 165.667 (authorizing trap and trace order if court finds probable cause to believe that an individual is committing, has committed, or is about to commit a particular felony). We disagree. The record shows that the trial court did not focus solely on past offenses.

[9] The state further argues that the evidence should not be suppressed because the officers relied in good faith on the lawfulness of the order. We also reject that argument without discussion. *See State v. Johnson*, 120 Or App 151, 156, 851 P2d

We first consider the state's argument that the 1998 trap and trace order was lawful because it was supported by probable cause. That argument consists of two subparts. First, the state contends that the trial court's staleness determination was incorrect in light of the ongoing business relationship between American Agriculture and its customers. Second, it argues that the trial court erroneously focused on probable cause solely as to American Agriculture rather than also as to its customers. The state urges that Shropshire's affidavit established probable cause to believe that marijuana growers would be discovered even if it did not establish probable cause to believe that an ongoing conspiracy existed between American Agriculture and its customers.

We begin with the state's staleness argument. Applications for trap and trace orders are governed by ORS 165.663, which provides, in part:

"The application shall:

"* * * * *

"(3)   Contain a statement demonstrating that there is probable cause to believe that an individual is committing, has committed or is about to commit a particular felony of murder, kidnapping, arson, robbery, bribery, extortion or other crime dangerous to life and punishable as a felony, or a crime punishable as a felony under ORS 475.992 or 475.995, or any conspiracy to commit any of those crimes, and that use of a pen register or trap and trace device will yield evidence relevant to the crimes."

See also ORS 165.667 (setting out requirements for trap and trace orders, including requirement that court entering an order do so upon finding of probable cause). We review the order and supporting application for compliance with those provisions and with the standards applicable to search warrants. See ORS 165.667(1) (requiring application for trap and trace order to be made under ORS 133.545, the statute setting out procedures and standards for issuance and execution

1160, *rev den*, 318 Or 26 (1993) ("Article I, section 9, does not have a 'good faith' exception.").

of search warrants). Consistently with ORS 133.545, an affidavit supporting a trap and trace order must permit a neutral and detached magistrate to conclude that probable cause justifies issuance of the order. ORS 133.545(4). In *State v. Wilson*, 178 Or App 163, 167, 35 P3d 1111 (2001), we described our review of the sufficiency of an affidavit for a search warrant:

> "In testing an affidavit, a court is to construe it in a commonsense, nontechnical and realistic fashion looking at the facts recited and the reasonable inferences that can be drawn from those [facts]. Because of the preference for warranted searches over those conducted without prior judicial authorization, doubtful cases are to be resolved by deferring to an issuing magistrate's determination of probable cause."

(Citations and internal quotation marks omitted; brackets in original.) In particular, staleness is an important consideration because probable cause must exist at the time that the order is issued. *State v. Howell*, 93 Or App 551, 559, 763 P2d 179 (1988), *rev den*, 307 Or 405 (1989). We evaluate the issue of probable cause, including any staleness component, in the totality of the circumstances. *Id.*

■   In this case, Shropshire's affidavit fails to make clear exactly when the CRI provided the information to MTF as well as when the CRI actually obtained the information. Shropshire averred that, "as of February 1995 I had received information from a [CRI]." He also stated that the CRI had told him that Martin had been involved in the manufacture of marijuana "during the years prior to 1995"; that Martin had told the CRI that he had compiled a list of growers "prior to 1995"; that, "as of 1995," Martin had told the CRI that at least 50 percent of his business was from growers; and that the CRI knew, "as of February 1995," that Martin personally delivered merchandise to some customers. In other words, all of the CRI's information concerned events that had occurred at some unstated time before (or, at the latest, in) February 1995.[10] Thus, when the court issued its 1998 order, the CRI's

---

[10] Similarly, the age of the information regarding American Agriculture's practice of giving receipts reflecting cash sales to customers who paid by check or credit card is unspecified, both as to when MTF obtained the information and when the practice allegedly occurred.

information apparently was at least three years old, and possibly even older. *See, e.g., State v. Trax,* 179 Or App 193, 200, 39 P3d 887, *rev allowed,* 334 Or 491 (2002) (information that marijuana had been found in the defendant's apartment more than a year earlier did not support probable cause to authorize a search of her apartment).

Nor did the information in the application for the 1998 order support an inference that the relevant conduct had continued over a substantial period of time. That is important in light of the nature of the crime at issue here—an ongoing conspiracy. For example, if the application for the 1998 order had included information from the second informant—whose statement to federal prosecutors indicated that a conspiracy had existed in 1985—as well as information demonstrating that the original CRI's knowledge concerned events that had occurred during, rather than before, 1995, a reasonable magistrate might infer not only that a conspiracy had endured from 1985 to 1995 but also that it was continuing in 1998. But the application was devoid of any information demonstrating that the targeted conduct had continued over time and, thus, likely was ongoing.

The state remonstrates that the ongoing seizures of marijuana from American Agriculture's customers overcame the age of the other information included in the 1998 application. It notes that, in his supporting affidavit, Shropshire stated, "As of August 21, 1996 the [MTF] had seized 394 marijuana grows * * *." The state reminds us of cases where we have held that evidence that was more than 18 months old at the time a search warrant was issued was not stale. *See, e.g., State v. Gale/Rowden,* 105 Or App 489, 497, 805 P2d 158, *rev den,* 311 Or 427 (1991). In those cases, however, other, more recent, evidence contributed to the "totality of the circumstances," thereby establishing a current basis to support the existence of probable cause. For example, in *Gale/Rowden,* the affidavit showed that the defendant had been involved in a methamphetamine manufacturing operation two years earlier. *Id.* at 493. Despite the age of that information, we upheld the warrant, in part because the affidavit also showed that, "within the last two weeks," the police had received information about a newly discovered methamphetamine lab near the defendant's residence. *Id.* at 491-92. By

contrast, in this case Shropshire did not aver in 1998 that MTF had seized additional evidence of marijuana operations in the 17 months after the federal warrant expired. Again, no recent information supplemented the older information described above.

▪ Probable cause requires more than the mere possibility that criminal activity is ongoing or that evidence of a crime will be discovered. *Wilson*, 178 Or App at 167 (citing *State v. Carter/Grant*, 316 Or 6, 13, 848 P2d 599 (1993)). It requires that such evidence more likely than not will be discovered. *State v. Arana*, 165 Or App 454, 456, 998 P2d 688 (2000). We conclude that the facts provided to the magistrate who issued the 1998 trap and trace order failed, in total, to establish probable cause to believe that Martin was engaged in an ongoing criminal conspiracy with his customers. At most, the evidence showed that such a conspiracy may have existed at some unspecified time at least 17 months earlier. It did not show that a conspiracy likely existed in March 1998. The trial court did not err in concluding that the order was not supported by probable cause to believe that a conspiracy existed between American Agriculture and its customers.

▪ We briefly consider the state's second argument relating to the lawfulness of the 1998 order. The trial court apparently believed that, in order to uphold the order, it had to determine that the evidence presented to the magistrate showed the existence of a conspiracy between American Agriculture and its customers. The state at no point objected to that understanding, nor did it argue that the existence of probable cause to believe that customers alone were conducting marijuana growing operations was sufficient to support the order. Thus, the latter argument could succeed on appeal only under a "right for the wrong reason" rationale. The problem is that, if the state had made that argument to the trial court, defendant might have developed a materially different record from the one before us. One example suffices to illustrate the point. Defendant asserts that the number of customer arrests or seizures over a given period of time proves little or nothing in the absence of additional statistical data about defendant's business, including a comparison of that number with the total number of customers that the business

served during the same period. We agree that such a comparison would have been useful in conducting a thorough probable cause analysis under the state's new theory. Because the state did not raise that theory before the trial court, we decline to consider it for the first time on appeal. *See State v. Enakiev*, 175 Or App 589, 598, 29 P3d 1160 (2001) ("appellate courts should affirm trial court's ruling on alternative ground only where 'the record [is] materially * * * the same one that would have developed had the prevailing party raised the alternative basis for affirmance below'") (quoting *Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001)). Accordingly, we conclude that, because the 1998 trap and trace order was not supported by probable cause, it violated ORS 165.667.

We turn to whether defendant is entitled to the remedy of suppression. Before the trial court, the state argued that suppression was not an available remedy because, at most, the 1998 trap and trace order violated a statute. *See* ORS 136.432 (providing that a court may not exclude relevant evidence in a criminal action because of a statutory violation unless exclusion is required by a constitutional provision). Defendant replied that one or more statutes required suppression and, in addition, that the order violated his protected privacy interests under Article I, section 9. The trial court rejected defendant's statutory argument but agreed with his constitutional argument, concluding, in effect, that the creation of statutory procedures for police to obtain phone numbers "constitutionalized" the interests affected by the trap and trace statutes. On appeal, the parties renew their debate on each of the foregoing questions. However, we need not resolve those questions here because, regardless of their disposition, defendant would not be entitled to the remedy of suppression if the trial court correctly determined that the evidence obtained from the search of his property was not the product of police exploitation of the 1998 trap and trace order. Hence, we turn to that issue.

Defendant asserts that the trial court erroneously concluded that the issuance of the search warrant was sufficiently independent from the 1998 trap and trace order as to purge the taint of its unlawfulness. The state responds that

no exploitation occurred because any taint was purged by the passage of several days between the trapping of defendant's telephone number and the issuance of the search warrant, the discovery of information concerning defendant's power usage, and the plain smell of marijuana detected at his residence.

■ As noted, we analyze the validity of the search warrant in the same manner that we analyzed the validity of the trap and trace order. *See State v. Binner,* 128 Or App 639, 645, 877 P2d 642, *rev den,* 320 Or 325 (1994) ("Our review is limited to determining whether, on the basis of the information contained in the application for the warrant, a neutral and detached magistrate could have concluded that there was probable cause to believe [the matter asserted]."). When an application for a search warrant includes tainted information, we excise that information and determine whether the remaining information in the application furnishes probable cause. *Id.* at 646. In this case, if the discovery of defendant's power records and the officers' observations at defendant's residence were tainted by the unlawful order, the search warrant would not have been supported by probable cause.

■ Information is tainted if it was derived from the exploitation of earlier, unlawful police conduct. *State v. Cardell,* 180 Or App 104, 116, 41 P3d 1111 (2002). However, the fact that, "but for" the unlawful conduct, the police would not have been in a position to seek a warrant does not, in and of itself, render any evidence uncovered during the ensuing search inadmissible. *See State v. Rodriguez,* 317 Or 27, 40, 854 P2d 399 (1993) (applying exploitation principle in context of consent search). Put differently, evidence is not necessarily tainted simply because it would not have come to light but for the unlawful conduct of the police. *State v. Paz,* 31 Or App 851, 869, 572 P2d 1036 (1977), *rev den,* 282 Or 189 (1978). The question, instead, is whether "the evidence to which instant objection is made has been come at by exploitation of that illegality or by means sufficiently distinguished to be purged of the primary taint." *Paz,* 31 Or App at 869 (internal quotation marks omited) (quoting *Wong Sun v. United States,* 371 US 471, 488, 83 S Ct 407, 97 L Ed 2d 441 (1963)).

██ ██ Defendant had the burden of establishing a factual connection between the unlawful trap and trace order and the evidence that he seeks to suppress. *Cardell*, 180 Or App at 114. Defendant met that burden by showing that the 1998 trap and trace order triggered the investigation that led the police to the evidence in his basement. The burden thus shifted to the state to demonstrate that the police did not, in procuring the search warrant, exploit the unlawful trap and trace order. *Id.* The state could have satisfied that burden by showing that the evidence was attributable to a source independent of the unlawful conduct, that the connection between the evidence and that conduct was so attenuated as to dissipate the taint, or that the evidence would inevitably have been discovered by proper and predictable police activity. *State v. Hacker*, 51 Or App 743, 749-50, 627 P2d 11 (1981).

Here, the state's theory is one of attenuation. Attenuation is "a relative concept applied as a matter of degree." *State v. Quinn*, 290 Or 383, 396 n 3, 623 P2d 630 (1981). Cases in which the doctrine has been applied "involve an event later than and independent of the illegal conduct which diminishes the legal, factual or logical connection between the evidence in question and the illegality." *State v. Hansen*, 91 Or App 189, 192, 754 P2d 604 (1988). In practical application, the difficulty lies in determining how much diminution is sufficient to free challenged evidence from the taint of unlawful government conduct to which it ultimately can be traced.

The state argues that two factual aspects of the police investigation were sufficient to purge the taint of the 1998 trap and trace order. First, the state relies on the fact that, before approaching defendant, the police separately, by means of subpoena, investigated his power consumption to determine independently whether there was a basis for further investigation. Second, the state points out that, when the police sought a warrant, the supporting affidavit demonstrated probable cause based on plain view observations at defendant's residence and did so without reference to the phone records. As discussed below, we agree that those intervening circumstances were sufficient to purge the taint of the unlawful trap and trace order.

We have found no Oregon case that addresses the application under Article I, section 9, of the attenuation doctrine to circumstances such as those present here, where unlawful conduct furnishes a lead that merely identifies the defendant as a person of interest to the police and triggers a further investigation of his or her activities. However, as noted, the attenuation doctrine has its roots in Fourth Amendment case law beginning with *Wong Sun*. *Hacker*, 51 Or App at 749-50; *Paz*, 31 Or App at 869. Accordingly, it is useful to consider the treatment of similar circumstances by the federal courts. Most nearly on point is *United States v. Smith*, 155 F3d 1051 (9th Cir 1998), *cert den*, 525 US 1071 (1999). *Smith* was an insider trading case in which a third party intercepted a fellow employee's voice mail message at work. The message identified the caller as the defendant, and it showed that he probably was involved in an insider trading scheme. A report about the message was provided to the Securities and Exchange Commission (SEC), which began an investigation of the defendant that continued over the next eight months. *Id.* at 1054. During the course of the investigation, the SEC obtained via subpoena an audiotape copy of the message. It ultimately referred the matter to federal prosecutors, who conducted their own extensive investigation and, eventually, obtained an indictment against the defendant. *Id.*

The defendant moved to suppress the evidence obtained against him during the investigations. He asserted that the initial voice mail recording was unlawfully intercepted under the federal Wiretap Act, 18 USC sections 2510 and 2520, and that the entire investigation against him was derived from and tainted by that interception. On appeal, the Ninth Circuit held that the act of retrieving and recording the defendant's voice mail message was an interception that was subject to suppression under an exclusionary provision of the Wiretap Act. *Smith*, 155 F3d at 1059. The decisive question then became whether the evidence amassed during the ensuing investigations was derived from the unlawful interception and, thus, subject to suppression. *Id.* at 1060.

The Ninth Circuit rejected the defendant's argument that the evidence should be suppressed because the

intercepted message was the "impetus" for starting the investigation. The court held that the defendant's argument was no more than a re-labeled theory of "but for" causation that it had repeatedly renounced. *Id.* at 1061. The court further held that the question of taint cannot be answered on the basis of causation in the logical sense alone. *Id.* Instead, it stated that the baseline inquiry is

> "whether anything seized illegally, or any leads gained from illegal activity, tend[ed] *significantly to direct* the investigation toward the specific evidence sought to be suppressed. And although it is by no means clear precisely what constitutes 'significant direction' sufficient to trigger the exclusion remedy, courts have deemed it probative whether the initial illegality led *directly* to any of the evidence actually used against the defendant at trial, or, to put the matter slightly differently, whether the government's evidence was the 'direct result' of an unlawful search or seizure. On the other hand, it is *not* sufficient in demonstrating taint that an unlawful wiretap may have been a factor in the decision to target a specific defendant, or that an illegal search uncovers the alleged perpetrator's identity, and therefore directs attention to a particular suspect. The nexus between the original illegality and the specific evidence subject to challenge must be a close one."

*Id.* (citations and internal quotation marks omitted; emphasis in original). The court held that suppression was not required in that case because, at most, the message "tipped off the government to the fact that a crime had been committed and to the probable identity of the perpetrator. It was * * * a 'lead.' A lead, however, is simply not enough to taint an entire investigation." *Id.* at 1063.

We find the Ninth Circuit's reasoning to be sound and conclude that it is appropriate to apply a similar analysis under Article I, section 9. Here, as in *Smith*, the trap and trace order was merely the starting point for the police investigation of defendant's activities. That focus would have ended if it had not been sharpened by the unusually high power consumption at defendant's residence. But even *that* information merely intensified police interest in defendant to the point that they decided to visit his residence for the purpose of obtaining his consent to search. That quest, in turn,

was obviated when the officers detected the odor of marijuana coming from defendant's house. At that point, the issue was no longer one of consent but, instead, of probable cause. The search warrant was adequately supported by an affidavit reciting evidence—the power records and the odor of marijuana—that was obtained only after an extended investigation carried out was over a period of days.

On a spectrum of causation, if there is more than a mere "but for" factual or logical connection between the unlawful 1998 trap and trace order and the discovery of the marijuana growing operation in defendant's residence, there is not much more. It is true that the police focused on defendant as a result of the unlawful order and that that focus did not abate during the ensuing investigation. However, as described above, the police did not seek a search warrant until they had pursued the investigation sufficiently to obtain probable cause independently—except for that focus—of the trap and trace records. Here, as in *Smith*, the unlawful conduct furnished the authorities with a lead, nothing more. In fact, if anything, the lead was less inculpatory than in *Smith*, where the intercepted message actually identified the defendant as the probable perpetrator of a crime. Under the circumstances, the taint of the unlawful order was purged by the intervening police investigation and suppression is not an appropriate remedy for a violation, if any, of defendant's constitutionally protected privacy interests.

Affirmed.