Argued and submitted September 8, 2004, vacated and remanded February 2, 2005

# STATE OF OREGON,
*Respondent,*

*v.*

# TOMMY KEITH HARPER,
*Appellant.*

## 0003315CR; A118880

105 P3d 883

Priscilla A. Maloney argued the cause and filed the brief for appellant.

Rebeca Piedra, Certified Law Student, argued the cause for respondent. On the brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Janet Klapstein, Assistant Attorney General.

Before Landau, Presiding Judge, and Brewer, Chief Judge, and Arnold, Judge pro tempore.

BREWER, C. J.

## BREWER, C. J.

A jury convicted defendant of possession of a controlled substance. ORS 475.992(4). Before trial, defendant filed a motion to suppress statements that he made during an encounter with police and evidence seized at his home. The trial court denied the motion, ruling that the encounter was not a stop and that the evidence found in defendant's residence was seized under a valid search warrant. On appeal, defendant first argues that the trial court erred in denying his motion to suppress because the police unlawfully stopped him and the search warrant was issued, in part, based on statements that he made during the stop. Defendant also argues that, even if the stop was lawful, the information in the affidavit in support of the search warrant was insufficient to establish probable cause to believe that evidence would be found at his home. On review for errors of law, *State v. Stephens*, 184 Or App 556, 560, 56 P3d 950 (2002), *rev den*, 335 Or 195 (2003), we vacate the judgment and remand for further proceedings.

We take the following facts from the trial court's findings at the hearing on the motion to suppress and from undisputed evidence in the record.[1] An unnamed employee of the "Big R" store in Klamath Falls informed Detective Shepherd that defendant had purchased one gallon of seven percent tincture of iodine, a substance that is used in large quantities in the manufacture of methamphetamine. The cashier at the store had requested defendant's identification and had written down defendant's driver's license number, which he gave to Shepherd. DMV records revealed defendant's address. Two days later, when defendant left his home on his bicycle, Detective Holloway followed him. Holloway was in plain clothes and driving an unmarked vehicle. He asked his dispatcher to route any officer in the area to defendant's location so that Holloway could speak with defendant.

Detective Streifel saw defendant riding his bicycle on the sidewalk, parked about a block ahead of defendant,

---

[1] Part of the suppression hearing was not recorded. As explained below, that fact plays a significant role in our disposition of the case.

and waited on the sidewalk next to his patrol car for defendant to approach. Streifel was in uniform with his badge displayed. The overhead lights on his patrol car were turned off. When defendant was near enough that Streifel could speak to him in a normal tone, the detective identified himself and asked if he could talk to defendant "for a minute." He did not order defendant to stop or make any other overt displays of authority, but defendant did stop. Before saying anything else, Streifel asked defendant for identification, and defendant gave it to him. Streifel retained defendant's identification and called a dispatcher from his shoulder radio to check for outstanding warrants. At some point during the encounter, Streifel asked defendant if he had any weapons, which defendant denied. Streifel also asked for defendant's consent to search his person; defendant declined. Seconds after Streifel asked defendant for his identification, Holloway approached them on foot.

While Streifel checked for warrants, Holloway asked defendant about the iodine purchase. Defendant told Holloway that a man, whom he described as "a rancher," had stopped him in front of the Big R store and asked defendant to buy the iodine for him. According to defendant, the rancher explained that he could not buy the iodine himself because he had left his identification at home. Defendant stated that the rancher gave him the money to buy the iodine plus $50 for making the purchase. Defendant told Holloway that he did not know the man but indicated that he lived south of town. Holloway asked defendant for permission to search his person and his residence, but defendant again declined. As Holloway was leaving, he told defendant that he would try to obtain a search warrant.

While Holloway was speaking to defendant, Streifel "stayed back a little ways" because he could not hear the radio over their conversation and did not want to interrupt them. The record does not establish precisely when Streifel returned defendant's identification to him, although, at the hearing on defendant's motion to suppress, the following exchange took place, indicating that Streifel still had the identification when Holloway began questioning defendant:

"[COUNSEL]: And, so while you had [defendant's] identification and were radioing it in, Detective Holloway arrived?

"[STREIFEL]: Yes.

"[COUNSEL]: Detective Holloway began to ask [defendant] questions at that point?

"[STREIFEL]: Yeah, they had a conversation * * *."

At no point during the encounter did either detective tell defendant that he was not free to leave, and defendant did not ask or attempt to leave until the detectives had finished talking to him. The entire encounter lasted less than five minutes.

Later that day, Detective Fenner spoke with a local veterinarian, who told him that iodine is used to treat the navels of newborn calves and injuries to horses' feet. The veterinarian told Fenner that one gallon of iodine would treat between 100 and 200 calves. Fenner checked defendant's criminal record and found that defendant had been arrested for possession of methamphetamine and released less than three months earlier. Defendant's record also revealed that he had been arrested again less than one month earlier for violating his release agreement by failing to submit to a urinalysis. The record also showed that defendant had two marijuana-related arrests, in 1972 and 1977.

Based on the information at his disposal, Fenner concluded that defendant was involved in a conspiracy to manufacture methamphetamine. He applied to the Klamath County Circuit Court for a warrant to search defendant's person, his home, and his van for evidence of that crime. In the affidavit in support of the warrant, Fenner set out a number of general facts based on his training and experience. For example, he stated that people who manufacture methamphetamine often do so in groups. He further stated that illegal drug manufacturers also are involved in distributing the substances that they manufacture. In addition, Fenner stated that such people frequently have in their homes evidence pertaining to manufacturing and distribution operations; he listed items ranging from scales and plastic baggies to records of chemical purchases and drug sales, large

amounts of cash, and methamphetamine itself. Fenner explained that iodine is one of three main ingredients in the manufacture of methamphetamine and that a gallon of seven percent tincture can produce up to one and one-half pounds of diluted, "street level grade" methamphetamine.

In the affidavit, Fenner also related a number of facts specific to this case. He stated that "an employee of Big R" had informed Shepherd that defendant had purchased a gallon of seven percent tincture of iodine. He stated that the employee had copied defendant's driver's license number and that Fenner had checked it with DMV records. He recounted defendant's statement to Holloway that defendant had purchased the iodine for an unidentified rancher for $50. Fenner stated that the price of one gallon of iodine at the Big R store was $26.95. He attested that, in his experience, it was unlikely that a rancher or any other person would spend an extra $50 to save a trip home to retrieve his or her identification. Fenner also described his conversation with the veterinarian and stated that he had observed defendant's residence; he characterized the yard as too small to be suitable for livestock and stated that there were no animals visible in the yard.

The court issued the search warrant. When the detectives executed the warrant, they found several items in defendant's house consistent with methamphetamine use, including a hollowed out pen body with a white, powdery substance in it. The substance tested positive for methamphetamine. As a consequence, defendant was charged with possession of a controlled substance.

Before trial, defendant filed a motion to suppress all evidence gathered as a result of his encounter with Streifel and Holloway, as well as the evidence seized pursuant to the search warrant. The trial court concluded that the initial encounter was not a stop and, therefore, that evidence of defendant's statements to Holloway was lawfully obtained. The court determined that, on their face, defendant's statements to Holloway "lacked any credibility whatsoever." Although the court stated that the sufficiency of the warrant was a "close case," it concluded that Fenner's affidavit established probable cause to believe that evidence would be found

in defendant's home. The court stated that "[t]he unbelievable story that defendant told to the police about the iodine plays a large part in this determination." The court denied the motion to suppress. At trial, the state introduced the evidence found in defendant's home, and the jury returned a guilty verdict. This appeal followed.

As noted, in his first assignment of error, defendant argues that the trial court erred in denying his motion to suppress his statements to Holloway. In his second assignment of error, defendant argues, in part, that, even if Fenner's affidavit properly included his statements to Holloway, it did not establish probable cause to issue the warrant. If defendant's latter argument is correct, it will be unnecessary to address his first assignment of error challenging the inclusion in the affidavit of defendant's statements to Holloway. Therefore, we consider the assignments of error in reverse order.

Defendant challenges several aspects of Fenner's affidavit, including the reliability of the information from the store employee. He argues that the trial court should have excised that information from the affidavit. Defendant also argues that, even without any facts excised, the affidavit did not establish a nexus between any illegal activity and his residence. In other words, defendant contends that nothing in the affidavit established that, more likely than not, incriminating evidence would be found at his residence.[2]

In determining whether an affidavit is sufficient to support a search warrant, a magistrate must decide (1) whether there is reason to believe that the facts stated are true, and (2) whether the facts disclosed by the affidavit, if true, are sufficient to establish probable cause to justify the requested search. *State v. Villagran*, 294 Or 404, 408, 657 P2d 1223 (1983).

---

[2] Defendant also argues that the previous methamphetamine-related arrests "must be discounted to honor defendant's presumption of innocence." We do not understand the point of defendant's argument. The trial court did not specify how much weight it gave to those arrests, and defendant does not explain what the effect of "discounting" the information would be. Moreover, defendant does not argue that the information is irrelevant to the probable cause determination. We do not consider his "discounting" argument further.

■ We begin with defendant's argument that the affidavit failed to establish the reliability of the information obtained from the unnamed store employee. When an affidavit is based on information supplied by an unnamed informant, the affidavit must show that the information is reliable by demonstrating the basis for the informant's knowledge and including facts that establish the informant's veracity. ORS 133.545(4); *State v. Carlile*, 290 Or 161, 164, 619 P2d 1280 (1980). In this case, the basis for the informant's knowledge is direct observation, and defendant does not dispute that that is sufficient. The focus of the dispute, rather, is whether the affidavit establishes the veracity of the informant. The "veracity" of the informant refers to the extent to which the information supplied is "trustworthy on a specific occasion." *State v. Wheelon*, 137 Or App 63, 70, 903 P2d 399 (1995), *rev den*, 327 Or 123 (1998). Veracity can be established in several ways, including corroboration by the police or corroboration by another informant. *State v. Pelster/Boyer*, 172 Or App 596, 604-05, 21 P3d 106, *rev den*, 332 Or 631 (2001).

In his affidavit, Fenner stated:

"On November 15, 2000, an employee of Big R informed Detective Shepherd that [defendant] purchased one gallon of 7% tincture of iodine from the Big R store * * *. [Defendant] was identified by the cashier who requested identification from [defendant] and copied his driver's license number on a piece of paper.

"I checked [defendant's] driver's license number through DMV, and discovered [his address]."

The affidavit further showed that defendant himself had corroborated the employee's statement when he admitted to Holloway that he had purchased the iodine. Defendant argues that his own statement could not serve as corroboration of the store employee's statement because the trial court found his story about buying the iodine for a rancher not to be credible. According to defendant, "[e]vidence from an admitted noncredible source cannot serve as corroboration of an unnamed hearsay informant." However, the trial court found that defendant's *explanation* for buying the iodine was unbelievable, not his admission that he had bought it. A particular

piece of information may be trustworthy even though the relator is not generally credible. *State v. Alvarez*, 308 Or 143, 147, 776 P2d 1283 (1989). The similarity of information provided by two or more independent sources establishes the veracity of that information; it indicates that neither source fabricated the story from whole cloth. *State v. Hasselback*, 55 Or App 281, 286, 637 P2d 1316 (1981), *rev den*, 292 Or 825 (1982). In short, the fact that defendant corroborated the information supplied by the store employee established the trustworthiness of that information. The court did not err in declining to excise from the affidavit the reference to the employee's statement.

■   We turn next to defendant's contention that the affidavit did not establish a nexus between his residence and any unlawful activity. In the affidavit, Fenner averred that the building to be searched was defendant's home and that, based on his training and experience, he knew that people involved in the unlawful manufacture of controlled substances often keep evidence of that activity in their homes. Defendant challenges the sufficiency of Fenner's training and experience to establish that such evidence probably would be found in his home.[3]

Fenner's assertion that incriminating evidence often is found in the homes of illegal drug manufacturers was pertinent only if the affidavit showed as a foundational matter that defendant more likely than not was involved in the manufacture of methamphetamine. *Cf. State v. Anspach*, 298 Or 375, 381, 692 P2d 602 (1984) (affidavit in support of warrant to search home in proximity of outdoor marijuana growing operation must first "set forth objective observations that would permit a disinterested magistrate to conclude that there is probable cause to believe that the persons residing on the premises have some relationship to the plants"). Thus, we consider that issue first.

---

[3] No question is raised on appeal about whether the statements in the affidavit that drug-related evidence is *often* found at the residence of someone engaged in the manufacture or distribution of controlled substances are sufficient to establish that it is *probable* that such evidence will be found at the residence to be searched pursuant to the warrant. We therefore do not consider that issue.

Defendant argues that the "legal, innocent activity" of buying iodine is not a sufficient basis for the conclusion that, more likely than not, he was manufacturing a controlled substance. However, purchasing iodine is neither legal nor innocent if the purchaser intends to use it to manufacture methamphetamine. *See* ORS 475.940(1), (3)(jj) (providing that iodine matrix is a "precursor substance"); ORS 475.967(1) (providing that possession of a "precursor substance" is unlawful if the person possessing it intends to manufacture a controlled substance). It follows that evidence of an iodine purchase coupled with evidence of unlawful intent may furnish probable cause to believe that the purchaser is involved in manufacturing methamphetamine. We therefore consider whether the affidavit contained evidence of unlawful intent.

Intent may be shown by circumstantial, rather than direct, evidence. *State v. Rose*, 311 Or 274, 282, 810 P2d 839 (1991). The affidavit showed that defendant recently had been arrested for possession of methamphetamine, that he had purchased a large quantity of one of the main ingredients in methamphetamine, and that, when asked about purchasing the iodine, he gave an explanation that, in the words of the trial court, "lacked any credibility whatsoever." Defendant argues that, even if the story was unbelievable, Fenner's suspicion that he intended to use the iodine to make methamphetamine reflected only one possibility among many. *Cf. State v. Carter / Grant*, 316 Or 6, 13, 848 P2d 599 (1993) (issuing magistrate's conclusion that marijuana would probably be found, based on affiant's statement that color and stem shape of plants observed was consistent with marijuana, was merely one possibility among many). But the fact that defendant's story was not credible does more than merely remove that explanation from the realm of plausible reasons for his purchase of the iodine. The concomitant fact that defendant lied gave rise to a reasonable inference—at least for purposes of establishing probable cause—that he lacked an innocent intent and, conversely, that he intended to use the iodine for an unlawful purpose. Based on the information in the affidavit pertaining to defendant's intent, a reasonable magistrate could conclude that, more likely than not, defendant was involved in the manufacture of methamphetamine.

Finally, defendant argues that Fenner's statement regarding his training and experience was insufficient to establish a nexus between defendant's involvement in the manufacture of methamphetamine and his home. Defendant relies on *State v. Wilson*, 178 Or App 163, 172, 35 P3d 1111 (2001). In that case, the affidavit showed that the defendants had sold methamphetamine to an informant and that the building to be searched was their residence. *Id.* at 165. Aside from the fact that they lived there, the only information in the affidavit connecting the unlawful activity to the residence was a statement by the affiant, similar to the one made by Fenner, that, based on his training and experience, he knew that people involved in drug distribution often keep evidence of that activity in their homes. *Id.* at 166. We held that the affiant's "expertise was simply too 'unconnected to objective facts derived from other sources' to provide probable cause to search [the] defendants' residence." *Id.* at 172 (quoting *State v. Goodman*, 328 Or 318, 328, 975 P2d 458 (1999)).

*Wilson* does not stand for the proposition that officer training and experience of the sort described in that case and at issue here cannot establish probable cause to search the residence of a person suspected of illegal drug activity. We did not reject the validity of the affiant's expertise in that case. Our conclusion was based on the absence in the affidavit of (1) any indication of when the defendants had sold the drugs to the informant; (2) evidence that the activity was ongoing; and (3) evidence as to the scope of their involvement. The affidavit stated only that, at some time in the past, the defendants had sold an undisclosed amount of methamphetamine in a location other than their home. *See id.* at 171-72. In short, the officer's expertise was not connected to sufficient "objective facts derived from other sources." *Id.* at 172. It therefore was not reasonable to infer, based on the affiant's expertise, that evidence would be found in the defendants' home.

The facts of this case distinguish it from *Wilson*. Here, only two days had passed since defendant had purchased the iodine, and the amount that he had purchased was consistent with the manufacture of a large quantity of methamphetamine. Thus, the timing and size of defendant's purchase indicated ongoing manufacturing activity. The

facts before us are more like those in *Villagran* and *Goodman*.

In the latter case, the defendant was seen leaving an outdoor marijuana growing operation. The police obtained a warrant to search for other evidence at his home, which was in the vicinity of the growing operation. In the affidavit in support of the warrant, the affiant stated that, based on his training and experience with outdoor growing operations, he knew that evidence of marijuana cultivation, processing, and distribution often is found in a secure indoor location— usually the grower's residence or another structure on the grower's property; he also stated that such evidence usually is not found at the site of the operation. 328 Or at 321-22. Nothing else connected the growing operation to the defendant's residence, apart from the fact that the defendant lived there. The Supreme Court held that the affidavit provided probable cause to believe that evidence would be found there:

> "The first fact linking the garden and the residence is that defendant, whose connection to the garden was demonstrated in the affidavit, lived at the residence to be searched. That fact links the garden and the house; in other words, the facts in the affidavit connecting the garden to defendant and defendant to the house connect the garden to the house. By extension, defendant also provides a link between the house and items of physical evidence from the garden. * * *

> "Indeed, there is more. Defendant's residence also is linked to evidence relating to the garden by reasonable inferences drawn from the facts in Stephens's affidavit. As noted, the affidavit establishes a high likelihood that evidence relating to the garden would be found in a secure indoor location. Defendant's residence is such a location; the affidavit makes clear that defendant resided at a house in the vicinity of the garden. It was reasonable to infer from that combination of facts and circumstances that some or all of the evidence from the garden probably would be found at that house."

*Id.* at 327-28.

In *Villagran*, the police discovered a large marijuana growing operation in a barn in Lookingglass. They learned that the person who had arranged for the barn to be built was

also building a house in Umpqua and that the person who owned the property on which the barn was built lived in Umpqua as well. Based on that information, the police obtained a warrant to search both Umpqua houses for additional evidence related to the growing operation. 294 Or at 407-08. The defendant argued that the connection with the builder's house was too tenuous to supply probable cause. The Supreme Court held that it was logical to conclude that either the person for whom the barn was built, the property owner, or both, were connected with the illegal activity; that, given the size of the growing operation, records pertaining to it existed; and, because no records were found in the barn, they would be found at one of the Umpqua houses. *Id.* at 415.

Here, objective facts in the affidavit showed that defendant probably was involved in manufacturing methamphetamine; in addition, the affiant's expertise demonstrated that more evidence of that crime likely existed and that such evidence likely would be found in defendant's home. A reasonable magistrate could conclude that there was probable cause to search defendant's home. It follows that, unless the trial court erred in denying defendant's motion to suppress evidence of his statements to Holloway, the court properly denied defendant's motion to suppress the evidence discovered during the search of his home. Accordingly, we must address defendant's first assignment of error.

■ Again, defendant argues that the trial court erred in denying his motion to suppress evidence of his statements to Holloway and in failing to excise that evidence from Fenner's affidavit. Defendant renews his argument that his encounter with the officers constituted an unlawful stop or seizure under ORS 131.615(1) and Article I, section 9, of the Oregon Constitution.[4] The state responds that there was no stop or

---

[4] ORS 131.615(1) provides that "[a] peace officer who reasonably suspects that a person has committed or is about to commit a crime may stop the person and, after informing the person that the peace officer is a peace officer, make a reasonable inquiry." Article I, section 9, provides, in part, that "[n]o law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]" Ordinarily, we consider statutory issues before constitutional ones. *State v. Lowry*, 295 Or 337, 343, 667 P2d 996 (1983). In determining whether a stop has occurred, however, the analysis is the same for both statutory and constitutional purposes. Thus, in our statutory analysis, we consider cases that address the issue under Article I, section 9. *State v. Ehly*, 317 Or 66, 76 n 8, 854 P2d 421 (1993).

seizure because, when Streifel initiated the contact, he did not block defendant's path, order him to stop, or make any other overt display of authority and, during the contact, neither detective prevented defendant from leaving. The state argues further that, even if the encounter constituted a stop, it was supported by reasonable suspicion.

■ ■　We first consider whether the encounter between defendant, Streifel, and Holloway was, or at some point became, a stop. A stop is a "temporary restraint of a person's liberty by a peace officer lawfully present in any place." ORS 131.605(6). As explained in *State v. Holmes*, 311 Or 400, 409-10, 813 P2d 28 (1991),

> "a 'seizure' of a person occurs under Article I, section 9, of the Oregon Constitution (a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable in the circumstances."

A police officer may restrain a person's liberty by physical force or by a show of authority. *State v. Warner*, 284 Or 147, 162, 585 P2d 681 (1978). Determining whether a stop or seizure has occurred requires a "fact-specific inquiry into the totality of the circumstances." *Holmes*, 311 Or at 408.

> "[L]aw enforcement officers remain free to approach persons on the street or in public places, seek their cooperation or assistance, request or impart information, or question them without being called upon to articulate a certain level of suspicion in justification if a particular encounter proves fruitful. A street or public place encounter does not amount to an Article I, section 9 'seizure' merely because the encounter may involve inconvenience or annoyance for the citizen and the other party to the encounter is known to be a law enforcement officer. Even physical contact does not transform the encounter into a 'seizure' if it is a normal means of attracting a person's attention (*e.g.*, policeman tapping citizen on the shoulder at the outset to get a citizen's attention). Rather, the encounter is a 'seizure' of a person only if the officer engages in conduct significantly beyond that accepted in ordinary social intercourse. The pivotal factor is whether the officer, even if making inquiries a private citizen would not, has otherwise conducted

himself in a manner that would be perceived as a nonoffensive contact if it had occurred between two ordinary citizens."

*Id.* at 410 (citation omitted).

■      The state argues that Streifel's initial encounter with defendant did not constitute a stop because there was nothing coercive about the encounter. Whether or not that is so, when Streifel retained defendant's identification, the nature of the encounter changed. Streifel had defendant's identification in his possession when Holloway approached and began questioning defendant. Although a request for identification does not, by itself, transform an encounter into a stop, *State v. Underhill*, 120 Or App 584, 589, 853 P2d 847, *rev den*, 318 Or 26 (1993), an officer's retention of a person's identification for investigatory purposes during questioning restrains the person from leaving and, therefore, constitutes a stop. *See, e.g., State v. Painter*, 296 Or 422, 425, 676 P2d 309 (1984); *State v. Atkin*, 190 Or App 387, 391, 78 P3d 1259 (2003); *State v. Jackson*, 91 Or App 425, 428, 755 P2d 732, *rev den*, 306 Or 661 (1988); *State v. Starr*, 91 Or App 267, 270, 754 P2d 618 (1988).

The state argues that no stop occurred because Streifel did not take defendant's identification to another location to run the records check; instead, the state notes, the detective "ran the warrants check from his shoulder radio, as he stood next to defendant who was perched on his bicycle." In the state's view, that conduct did not constitute the "retention" of defendant's identification.

We disagree. The record shows that Streifel was not standing next to defendant; he testified that he "stayed back a little ways" while Holloway talked to defendant. More importantly, though, the state does not explain, and we do not understand, the relevance of an officer's location in relation to the person whose identification he or she retains. The state relies on *State v. Gonzalez-Galindo*, 146 Or App 291, 293, 932 P2d 118 (1997), in which a police officer took the defendant's identification to his patrol car in order to run a records check. Our opinion in that case, however, attached no particular importance to that fact. In fact, the state conceded that the "defendant was unlawfully stopped when the officer

retained [his] ID card without a reasonable suspicion that [he] had committed a crime." *Id.* Where the officer took the card after retaining it was not pertinent.

In *State v. Hall*, 183 Or App 48, 55, 50 P3d 1258 (2002), *rev allowed*, 335 Or 195 (2003), we held that a stop had occurred when an officer requested the defendant's identification, relayed the information to a dispatcher over his shoulder radio, returned the identification immediately, and then waited for the dispatcher to respond with the result of the records check. The state argues that *Hall* is distinguishable because the officer in that case not only ran a records check but conducted a patdown search of the defendant. *See id.* at 51. Although that is true, the search in that case did not bear on our determination that the defendant had been stopped. The officer asked for permission to search the defendant because he noticed bulges in the defendant's jacket pocket while waiting for the result of the records check—in other words, after the defendant had been stopped. *Id.* We concluded that the officer's request for consent to search was an exploitation of the unlawful stop. *Id.* at 59; *see also State v. Smith*, 73 Or App 287, 292, 298 P2d 973 (1985) (holding that "the use of defendant's identification to check for arrest warrants constituted a show of authority that would lead a reasonable citizen in defendant's circumstances to believe that he was not free to leave unless the warrant check came back clear[,]" even when the actual identification itself had been returned to the defendant).

For the foregoing reasons, we conclude that the encounter between defendant and the officers became a stop no later than when Streifel retained defendant's identification and used it to conduct a warrant check while Holloway questioned defendant. The trial court erred in concluding otherwise.

■ Our analysis does not end there, though. A stop is lawful if it is supported by reasonable suspicion. ORS 131.615(1). Because Holloway questioned defendant during the stop, the focus is on what he knew at the time of the stop and whether his suspicion that defendant was involved in the manufacture of methamphetamine was reasonable. *See State v. Bond*, 189 Or App 198, 203, 74 P3d 1132 (2003), *rev den*,

336 Or 376 (2004) ("The circumstances presented to the officer * * * must support the reasonable inference that the person has committed a crime."). Because the trial court concluded that there was no stop, it did not address whether Holloway reasonably suspected that defendant had committed a crime. We have, in some cases, considered whether a stop was justified by reasonable suspicion where the trial court had concluded that there was no stop and, therefore, made no findings as to reasonableness. *See, e.g., Hall*, 183 Or App at 52, 56; *State v. Rocha-Ramos*, 161 Or App 306, 311-12, 985 P2d 217 (1999). Unlike those cases, however, the record here is incomplete; part of the hearing on defendant's motion to suppress, including all of Holloway's testimony, was not recorded. Taken together, the incomplete record on appeal and the trial court's lack of an opportunity to address a potentially dispositive issue militate against our deciding the issue on the record before us. Therefore, we vacate the judgment of conviction and remand for a further evidentiary hearing to determine whether the stop was supported by reasonable suspicion.

If, on remand, the trial court concludes that the officers had reasonable suspicion to stop defendant, then its earlier conclusion regarding the sufficiency of Fenner's affidavit in support of the search warrant shall remain unchanged, and it shall reenter the judgment of conviction. However, if the trial court concludes that the officers did not have reasonable suspicion to stop defendant, it shall excise from Fenner's affidavit any references to information obtained during that stop and reconsider the sufficiency of the affidavit to provide probable cause to issue the search warrant. *See State v. Mituniewicz*, 186 Or App 95, 108, 62 P3d 417, *rev den*, 335 Or 578 (2003) ("When an application for a search warrant includes tainted information, [the court] excise[s] that information and determine[s] whether the remaining information in the application furnishes probable cause."). If the affidavit is insufficient, defendant is entitled to suppression of the evidence found in his residence and to a new trial.

Vacated and remanded.